ORIGINAL

FILED
AUG 17 2007
U.S. COURT OF FEDERAL CLAIMS

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**BID PROTEST**

CWT/ALEXANDER TRAVEL, LTD,

and

CWT/EL SOL TRAVEL, INC.,

Plaintiffs,

v.

THE UNITED STATES,

Defendant.

Case No. 07-612 C

**COMPLAINT**

Pursuant to 28 U.S.C. § 1491(b), CWT/Alexander Travel, LTD ("Alexander Travel"), 4700 North University Avenue, Peoria, Illinois 61614, telephone no. (309) 693-3511, facsimile no. (309) 693-3520, and CWT/El Sol Travel, Inc. ("El Sol"), 1575 West University Drive, Suite 102, Tempe, Arizona 85281, telephone no. (480) 894-5533, facsimile no. (480) 894-9418, herein protest the award of five contracts by the United States Army (the "Army," the "Government," or the "Agency") under Solicitation Number W91QUZ-04-R-0007 (the "Solicitation") to AirTrak Travel ("AirTrak"), WingGate Travel ("WingGate"), and Alamo Travel Group ("Alamo").

On February 13, 2004, the Army issued as a small business set-aside Solicitation Number W91QUZ-04-R-0007. Final Proposal Revisions ("FPR") were due November 16, 2004. Alexander Travel and El Sol were among those that timely submitted FPRs in response to the Solicitation.

In early 2005, one contract, W91QUZ-05-C-0005 (Travel Area 100), was awarded to AirTrak; two contracts, W91QUZ-05-C-0005 and W91QUZ-05-C-0010 (Travel Areas 101 and 105), were awarded to WingGate; and two contracts, W91QUZ-05-C-0007 and W91QUZ-05-C-0009 (Travel Areas 102 and 104), were awarded to Alamo.[1] Recently, it has been learned that the five MEPS travel service contracts awarded to AirTrak, WingGate, and Alamo are scheduled to commence on or after October 1, 2007.

Alexander Travel and El Sol allege the following in support of its Complaint for declaratory and injunctive relief and damages against the United States of America:

**THE PARTIES**

1. Plaintiffs, Alexander Travel and El Sol, are headquartered in Illinois and Arizona, respectively. Plaintiffs are experienced Government contractors that specialize in providing travel management services to Department of Defense ("DoD") components and other agencies of the Federal Government. Alexander Travel and El Sol were offerors under the Solicitation and are prospective offerors whose direct economic interest is affected by the failure to competitively procure MEPS travel service contracts that will not commence until October 1, 2007, or later.

2. Defendant is the United States of America.

The cognizant Contracting Officer for the contract at issue is:

Ms. Sally Williams
U.S. Army Contracting Agency, Information Technology, E-Commerce, and Commercial Contracting Center ("ITEC4")
2461 Eisenhower Avenue, Room 984
Alexandria, Virginia 22331-1700
(703) 325-1965 (Telephone)
(703) 325-2241 (Facsimile)
sally.m.williams@us.army.mil (E-mail)

---

[1] Travel Area 103 was awarded to Alexander Travel.

## JURISDICTION

3. The United States Court of Federal Claims has jurisdiction over this action pursuant to The Tucker Act, codified at 28 U.S.C. § 1491(b) (2000).

## STATEMENT OF THE CASE

### I. THE SOLICITATION, THE PROCUREMENT, AND PROPOSAL SUBMISSIONS

4. On February 13, 2004, the Army issued as a small business set-aside Solicitation Number W91QUZ-04-R-0007 for travel management services at various Military Entrance Processing Stations ("MEPS"). MEPS are stations at which military recruits joining the military first report and are sent in groups to military bases to begin basic training. Thereafter, a significant number of offerors submitted proposals for each MEPS region.

5. The Solicitation made clear that the Army was requesting MEPS services in six large geographic travel regions of the U.S.

6. The contracts were to have a firm period of two years and three one-year options. The contracts were to start on April 1, 2005, and expire no later than March 31, 2010.

7. In response to the Solicitation, both Alexander Travel and El Sol expended significant time and funds to provide timely and responsive proposals. Each did so, and each was evaluated as being technically superior and evidencing a lower performance risk than AirTrak, WingGate, and Alamo. The only alleged advantage that AirTrak, WingGate, and Alamo had over any of the other offerors was that AirTrak, WingGate, and Alamo offered much lower transaction fees.

8. On the basis of those lower fees, the Army awarded contracts to AirTrak, WingGate, and Alamo.

9. It is understood that AirTrak, WingGate, and Alamo have taken advantage of a unique Equitable Adjustment Clause regarding Global Distribution System ("GDS") fees to substantially increase their transaction fee prices to levels now above the prices offered by Alexander, El Sol, and other offerors responding to the 2004 Solicitation.

10. It is understood that, due to exclusive rights to provide travel services to MEPS under pre-existing contracts awarded to CW Government Travel, Inc. ("CWGT"), the contracts awarded to AirTrak, WingGate, and Alamo could not be performed. Alexander and El Sol reasonably assumed that those contracts would be terminated and the MEPS travel service requirements recompeted upon the expiration of CWGT's contracts.

11. Allowing AirTrak, WingGate, and Alamo to commence providing MEPS travel services on October 1, 2007, represents either illegal sole-source contracts or a cardinal change in the contracts awarded under the 2004 Solicitation. Moreover, delaying the start of contract performance two and one-half years later than the dates and pricing required under the Solicitation renders the awards invalid.

12. The apparent decision to negotiate with AirTrak, WingGate, and Alamo on a sole-source basis to provide MEPS travel services commencing on October 1, 2007 also overlooks the following facts:

13. The Solicitation utilized 2002-2003 workload data for pricing and price evaluation. Actual workload data for Fiscal Year ("FY") 2006 indicates substantial variation from workload data at various MEPS locations used for the 2004 pricing of proposals. Thus, operational and price assumptions used in the Solicitation and award decisions are now invalid.

14. The Contract period is for 60 months (24 firm and three 12-month options). The Contract assumed a Contract period of April 1, 2005 to March 31, 2010 for pricing and

evaluation purposes. However, the Contract period of 60 months starts whenever service is actually implemented at the first MEPS site within a Travel Area. Since the Contracts are currently scheduled to start on October 1, 2007, they could extend to September 30, 2012, or two and one-half years beyond 2004 price proposals.

15. The Solicitation contained several unusual Equitable Adjustment Clauses. AirTrak, WingGate, and Alamo received special payments from one GDS company, Worldspan, which allowed them in 2004 to offer artificially low transaction fees. Since then, Worldspan's special arrangement with AirTrak, WingGate, and Alamo has changed and they have sought, or will seek, much higher transaction fees pursuant to the special Equitable Adjustment Clause in these contracts. Thus, the sole basis for award to these companies — extraordinarily low transaction fees — is no longer valid.

16. MEPS price evaluations were based on the assumption that MEPS would always be performed with Traditional Travel Service and that the Defense Travel Systems (the "DTS") would not be applicable to MEPS. It is not clear as to the current status of DTS and the probability of its use for MEPS travel in a multi-year contract period commencing on October 1, 2007.

17. The Contract is subject to the Service Contract Act. Offerors had to comply with 2004 Department of Labor ("DOL") Wage Determinations for the geographic regions within the Continental United States ("CONUS"). Contract prices are equitably adjusted to reflect subsequent increases in DOL Determinations. Since 2004, there have been significant increases to these DOL Wage Determinations. Thus, the pricing prepared in November 2004, and used for the early 2005 award decisions, is simply no longer valid. AirTrak, WingGate, and Alamo are eligible for substantial price increases before the contracts commence.

18. The Solicitation, at § H-4, required offerors to identify Key Personnel and stated that they "are considered critical to the successful performance of this contract." It also required that "this organization shall become effective upon award of the contract and its integrity shall be maintained for the duration of the contract effort." Clearly, the identification and evaluation of key personnel cannot be valid for contracts that commence two and a half years late.

## II. THE AGENCY-LEVEL PROTEST AND THE AGENCY'S RESPONSE

19. On June 18, 2007, Alexander Travel and El Sol filed an agency-level protest ("Agency-Level Protest") with the Chief Counsel of the U.S. Army Contracting Agency. See Exhibit 1. The Agency-Level Protest made clear, as discussed below, that allowing AirTrak, WingGate, and Alamo to commence performance of five-year MEPS travel service contracts on October 1, 2007, on the basis of proposals and prices submitted in November 2004, is unreasonable and is a clear violation of procurement law and policy on numerous grounds.

20. On July 17, 2007, the Deputy Chief Counsel for the Army Contracting Agency dismissed the Agency-Level Protest (the "Dismissal"). See Exhibit 2. The Army's Dismissal concluded that the Agency-Level Protest was untimely. The Army's Dismissal stated that the Agency-Level Protest was untimely because it objected merely to the terms of the Solicitation, which would make the Agency-Level Protest untimely per Federal Acquisition Regulation ("FAR") 33.103(3). Id. at 2.

21. The Agency Dismissal further stated, "[t]o the extent the protesters are objecting to post-award actions, actually taken or potentially to be taken, these objections are also untimely. The objections to these post-award actions are characterized by protesters as objections to the commencement of performance, under the protested contracts, on 1 October 2007, because of the substantial time since award." Id. at 3.

22. Contrary to the Army's conclusions, the Agency-Level Protest nowhere protested the terms of the Solicitation nor were Alexander Travel and El Sol protesting based on information they knew or should have known soon after award of the contracts to AirTrak, WingGate, and Alamo. Alexander Travel and El Sol learned that commencement of performance would be delayed on these contracts at an industry conference in June 2007, in which they were informed that these contracts remained alive and active, despite the inordinate passage of time. Alexander Travel and El Sol thereafter filed the Agency-Level Protest within days of receiving this information.

23. The Army's Dismissal confirmed that "it is anticipated that performance will begin on these contracts on or about 1 October 2007." Id. at 2.

24. This Protest follows.

## COUNT I

### (Failure to Consider Actual Contract Requirements)

25. Plaintiffs incorporate and reallege each of the allegations in the above paragraphs as if fully set forth herein.

26. FAR 15.606 ("Changes in Government requirements") states, "If a change is so substantial that it warrants complete revision of a solicitation, the contracting officer shall cancel the original solicitation and issue a new one, *regardless of the stage of the acquisition*. The new solicitation shall be issued to all firms originally solicited and to any firms added to the original list." FAR 15.606(a)(4) (emphasis added).

27. FAR § 16.504(a)(4)(iii) states that "[a] solicitation and contract for an indefinite quantity must . . . (iii) [i]nclude a statement of work, specifications, or other description, that reasonably describes the general scope, nature, complexity, and purpose of the supplies or

services the Government will acquire under the contract in a manner that will enable a prospective offeror to decide whether to submit an offer . . . ."

28. The Army's 2004 Solicitation and proposed commencement of contracts with AirTrak, WingGate, and Alamo fail to consider the Army's actual contract requirements with regard to the time period for contract performance, workload requirements, or pricing.

29. Because the Government's requirements have changed so fundamentally, the Government has, in effect, unlawfully sole-sourced multiple contracts without maximizing competition among other offerors.

30. Alternatively, because of the magnitude of the changes in requirements since the time the contracts were awarded, allowing the awardees to commence contract performance on October 1, 2007, is arbitrary and capricious because the awardees will be proceeding with performance on contracts that are subject to cardinal changes that mandate termination and recompetition.

### A. The Fundamental Change In Contract Requirements Results In An Unlawful Sole-Source Award

31. Because the Army's needs have so fundamentally changed in this case, allowing the awardees to continue performance of these contracts amounts to illegal sole-source contracts by the Army.

32. The Army solicited proposals in 2004 based on one set of contract requirements and assumptions and thereafter awarded contracts based on those requirements and assumptions. However, those contracts could not be performed due to conflicts with pre-existing contracts for the same requirements. Now, years later, the Army proposes to allow the awardees to commence performance on contracts with substantially different requirements — but without allowing other, more qualified offerors to compete on those requirements.

33. The Army's lack of advance planning has resulted in awards under which performance was not even initiated until two and a half years later. The almost three years that have elapsed between submission of proposals and start of performance of these contracts have rendered invalid both contract requirements and the assumptions under which the 2004 proposal evaluations took place.

34. The Agency's decision to circumvent full and open competition is unreasonable because more than one source can meet the Agency's actual needs: Alexander Travel and El Sol both submitted proposals that were, because of this passage of time, *in all respects*, more competitive than those submitted by the awardees.

35. The Army has known since 2005 that the MEPS travel service contracts could not be performed by AirTrak, WingGate, or Alamo prior to October 1, 2007, at the earliest. Thus, the Army has had ample time to conduct full and open competitions with qualified small business concerns to provide MEPS travel services upon the expiration of the Army contracts performed by Alexander Travel and El Sol's contracting partner, CW Government Travel, Inc.

36. There is no legitimate justification for the Army's failure to competitively procure — and therefore, in effect, sole source — MEPS travel service contracts commencing on October 1, 2007.

### B. In The Alternative, The Fundamental Changes In Contract Requirements Amounted To Cardinal Changes That Required Competition

37. Modifications to a contract that exceed the scope of the original contract must be subject to competitive procurement.

38. Significant changes have occurred with regard to both the contracts' assumptions and requirements. The modifications to the contracts can in no way be described as being related to or reasonably anticipated under the changes clause.

39. As such, if these contracts are not the result of illegal sole-source awards, then they suffer from cardinal changes that require, not mere modification, but a new competitive procurement.

**COUNT II**

**(Failure To Adequately Consider Contract Price Increases)**

40. Plaintiffs incorporate and reallege each of the allegations in the above paragraphs as if fully set forth herein.

41. All the awardees were evaluated as having worse technical evaluations and higher performance risk than either Alexander Travel or El Sol. It is understood that several other offerors were also evaluated as technically superior to and with a lower performance risk than AirTrak, WingGate, and Alamo. Only one factor was the alleged favorable distinguisher, the one that formed the sole basis for the rationale underlying award to the awardees: price.

42. The passage of time since contract awards has proven that the prices offered by AirTrak, WingGate, and Alamo in 2004 are no longer more favorable than those offered by Alexander Travel and El Sol. Price increases now required by AirTrak, WingGate, and Alamo appear to be higher than those offered by Alexander Travel and El Sol in every case.

43. The Army's proposed commencement of contracts with AirTrak, WingGate, and Alamo fail to adequately consider contract price increases. This mandates that contract performance by the awardees on October 1, 2007 must not be allowed.

**A. No Prices Were Offered For The Latter Half Of Contract Performance**

44. The 2004 Solicitation did not require that offerors propose pricing for the latter half of the newly proposed performance period (*i.e.*, October 1, 2007 to September 30, 2012). The Solicitation, instead, specified a period of performance starting when service is actually implemented at the first MEPS site within a Travel Area, which was assumed to be April 1, 2005

for each travel area. Since contract awards occurred more than two and a half years ago — and since the awardees are scheduled to perform for five years — the last two and a half years of performance (*i.e.*, April 1, 2010 to September 30, 2012) were not priced by any offerors in the November 2004 FPRs. This means that there is no evaluation of competitive pricing for half the proposed new contracts' term. Moreover, the extraordinary delay in commencing contract performance, coupled with extraordinary Equitable Adjustment Clauses, will result in significantly higher prices for the awardees.

45. As such, commencement of performance on these contracts on October 1, 2007 will undoubtedly be based on sole-source price negotiations with AirTrak, WingGate, and Alamo, resulting in arbitrary and capricious awards.

### B. The Contracts' Unique Equitable Adjustment Clauses Have Been Used To Effect Major Changes To Awardees' Offered Prices

46. The contracts to provide travel services to the MEPS, as well as other 2004 small business set-aside contracts to provide travel services to Air Force bases, contained a unique Equitable Adjustment Clause related to fees received by the contractor from GDS vendors. Such an Equitable Adjustment Clause had never been used in DoD travel service contracts before or since the 2004 MEPS and Air Force small business travel service contracts.

47. Such an Equitable Adjustment Clause based upon GDS vendor fees created a unique advantage for AirTrak, WingGate, and Alamo due to special arrangements they made with one GDS vendor, Worldspan. This unique Equitable Adjustment Clause allowed AirTrak, WingGate, and Alamo to "game" the 2004 procurements and offer transaction fees well below market rates. However, such reduced prices and evaluated cost savings for the Government were illusory because after contract awards Worldspan ceased the payments which allowed AirTrak,

WingGate, and Alamo to subsequently claim entitlement to substantial increases in transaction fees under the unique Equitable Adjustment Clause.

48. It is understood that all the awardees have already taken advantage of the identical Equitable Adjustment Clauses in the Air Force travel service contracts awarded at the same time as the MEPS awards to substantially increase the prices offered in November 2004 prices that resulted in the contract awards.

49. It is understood that AirTrak, WingGate, and Alamo are being paid transaction fees under the Air Force contracts, and would be entitled to similar price increases under the MEPS contracts, at rates now higher than either those proposed by Alexander Travel or El Sol. Thus, in November 2004, AirTrak, WingGate, and Alamo offered Transaction Fees ranging from approximately $3.23 to $4.12 to win the contracts.

50. It is believed that due to equitable adjustments, those transaction fees now range from $15.60 to $21.00. Thus, the transaction fees that would be paid to AirTrak, WingGate, and Alamo for MEPS travel services commencing in October 2007, would substantially exceed the fees that had been offered by Alexander Travel, El Sol, and other offerors for what would have been the third year (first option year) of the contracts.

51. The Government's recognition of the unfair advantage that the GDS fee Equitable Adjustment Clause created for the awardees, coupled with the realization that the Government would not realize substantial cost savings, has led to the decision not to use such an Equitable Adjustment Clause in the pending Solicitation for Worldwide DoD travel management services.

52. Having recognized the unfair and illusory competitive advantage created for AirTrak, WingGate, and Alamo in the 2004 Solicitation, it would be unreasonable, to the point

of arbitrary and capricious conduct, for the Government to perpetuate this mistake by rewarding those companies with MEPS travel service contracts commencing in October 2007.

**C. Prices And Staffing Offered In 2004 Bear No Reasonable Relation To October 2007 Because Of Drastic Alterations To Workload Requirements**

53. The 2004 RFP contained 2003 workload data for the 57 MEPS sites in Travel Areas 100, 101, 102, 104, and 105. While that workload data may have been adequate for FPRs submitted in November 2004, for contracts commencing on April 1, 2005, it is wholly inadequate for contracts commencing on October 1, 2007. In the pending DoD Solicitation for Travel Services Worldwide, RFP W91QUZ-06-R-0051 (the "Worldwide Solicitation"), the Government has acknowledged that it is important to provide workload data no older than 12 months when soliciting contracts with firm, fixed transaction fees.

54. A comparison between the 2003 workload data in the 2004 Solicitation that was used to develop pricing with actual 2006 workload data reveals substantial changes in the quantity and geographic location of MEPS workload. This information is broken down by Travel Area below.

***i. Travel Area 100***

55. At the seven MEPS sites in this Travel Area, the 2006 actual workload ranges from a decrease of 19% to an increase of 32% in comparison to the 2003 data. For example, in 2003, the workload for the MEPS in Syracuse, New York was 1,416 annual transactions, whereas in 2006, it was 2,091 transactions. Also, in Albany, New York, the MEPS workload in 2003 was 2,553 transactions, whereas in 2006, the workload was only 2,068 transactions.

***ii. Travel Area 101***

56. At the 10 MEPS sites in this Travel Area, the 2006 actual workload ranges from a decrease of 35%, to an increase of 11%, in comparison to the 2003 data.

57. For example, in 2003, the workload for the Berkley, West Virginia MEPS was 1,163 transactions, whereas in 2006, the actual workload was only 756 transactions. Further, in the Pittsburgh, Pennsylvania MEPS, the 2003 workload data was 3,780 transactions, whereas in 2006, the actual workload was only 2,692 transactions.

*iii. Travel Area 102*

58. At the 14 MEPS sites in this Travel Area, the 2006 actual workload ranges from a decrease of 43%, to an increase of 44%, in comparison to the 2003 data.

59. There are at least three telling examples in this Travel Area: First, in 2003, the workload for Nashville, Tennessee MEPS was 3,022 transactions, whereas in 2006, the actual workload was only 1,661 transactions. Second, in the Memphis, Tennessee MEPS, the 2003 workload data was 1,690 transactions, whereas in 2006, the actual workload was 2,544 transactions. Third, in the San Juan, Puerto Rico MEPS, the 2003 workload data was 2,984 transactions, whereas in 2006, the actual workload was only 2,239 transactions.

*iv. Travel Area 104*

60. At the 12 MEPS sites in this Travel Area, the 2006 actual workload ranges from a decrease of 71%, to an increase of 31%, in comparison to the 2003 data. This Travel Area also provides numerous clear examples of substantial changes in requirements that would impact an offeror's staffing and pricing. First, the 2003 workload data for the Amarillo, Texas MEPS was 5,514 transactions, whereas the 2006 actual workload data was only 1,619 transactions. Second, in the Albuquerque, New Mexico MEPS, the 2003 workload data was 918 transactions, whereas in 2006, the actual workload data was 1,331 transactions. Third, the 2004 RFP required a fully staffed MEPS in New Orleans to handle 3,000 annual transactions. However, the New Orleans MEPS has been closed since Hurricane Katrina hit New Orleans.

*v. Travel Area 105*

61. At the 13 MEPS sites in this Travel Area, the 2006 actual workload ranges from a decrease of 29.5%, to an increase of 69%, in comparison to the 2003 data. Again, numerous specific examples exist to illustrate the changes. For example, the 2003 workload data for the Salt Lake City, Utah MEPS was only 1,130 transactions, whereas in 2006, the actual workload was 3,613 transactions. In the Butte, Montana MEPS, the 2003 workload data was 2,288 transactions, whereas in 2006, the actual workload data was only 1,616 transactions. Finally, in the Los Angeles, California MEPS, the 2003 workload data was 8,063 transactions, whereas in 2006, the actual workload data was only 6,579 transactions.

62. As a result of these fundamental changes to workload, the staffing resources and prices proposed based on 2003 data are no longer valid in 2007 and beyond. Performance on these 2004 proposals must not be allowed to commence, since awards were made based on staffing allocation and prices that reflect completely inaccurate workload data.

**D. Prices Offered In 2004 Bear No Reasonable Relation To October 2007 Because Of Changes To Service Contract Act Wage Determinations By DOL**

63. DOL Wage Determinations made pursuant to the Service Contract Act of 1965, as amended, have increased substantially for many MEPS sites since the time that contracts were awarded. This may result in substantial price increases under the contracts awarded in early 2005, but would not impact all offerors equally.[2]

64. The 2004 Solicitation incorporated FAR 52.222-41 (Service Contract Act of 1965, As Amended), which required offerors to pay their service employees performing the

---

2 The impact of increases in DOL Service Contract Act Wage Determinations, since 2004, could vary significantly between offerors, depending upon the geographic locations being used by individual offerors to provide travel services to the 57 MEPS sites. In these five MEPS regions, only one MEPS site required a staffed Commercial Travel Office ("CTO") at the MEPS. Ironically, that mandatorily-staffed MEPS CTO was in New Orleans and has been closed since Hurricane Katrina.

MEPS travel service requirements compensation at least equal to the DOL wage determinations for the applicable geographic region.

65. The Solicitation incorporated the then current wage determinations that generally reflected DOL determinations made in 2003. However, FAR 52.222-41 requires the contractor throughout the contract period to pay its service employees compensation at least equal to *then current* DOL wage determinations. Thus, if a subsequent DOL wage determination increases the compensation required to be paid to any of the contractor's employees in any region, such increased costs may be passed on to the Government.

66. A comparison of the DOL wage determinations incorporated in the 2004 Solicitation with the current DOL wage determinations incorporated in the DOD Worldwide Travel Services Solicitation W91QUZ-06-R-0051 reveals that since proposals were submitted under the 2004 Solicitation there have been very significant increases in the wages and fringe benefits required by DOL to comply with the Service Contract Act. There has been an increase of 27% in fringe benefits required in DOL wage determinations in all CONUS regions.

67. Set forth below is a sample of basic wage increases at some of the busiest MEPS for "travel clerks I, II &III" under the DOL wage determinations since contracts were awarded under the 2004 RFP:

| **Location** | **Percentage Increase in Wages** |
|---|---|
| Little Rock, AR | over 12.7% |
| Los Angeles, CA | over 11% |
| San Jose, CA | from 17.36% to 21.03% |
| Jacksonville, FL | over 21% |
| Atlanta, GA | over 18% |
| Shreveport, LA | from 14.73% to 18.80% |
| Baltimore, MD | from 13.45% to 22.46% |
| Omaha, NE | over 10% |
| Portland, OR | over 13% |
| Philadelphia, PA | over 9% |
| El Paso, TX | over 18% |
| San Antonio, TX | over 16% |
| Richmond, VA | over 9% |

68. Thus, in the more than two and a half years' delay in starting performance of the MEPS travel services contracts, there have been very significant cost increases that could potentially be passed through to the Government before the contracts even start. Conversely, if offerors were preparing proposals currently to start in October 2007, they could structure their proposal to minimize the number of employees required in higher cost areas.

69. As such, Alexander Travel and El Sol were prejudiced by the Army's use of such outdated assumptions, and the awardees must not be allowed to commence performance of service contracts in October 2007 based on prices offered in November 2004.

### E. Contract Prices May Have Changed Because Of The Changing Role Of The Defense Travel System

70. In 2004, DoD did not know if or when the electronic DTS would be able to perform the group travel usually required for MEPS. Therefore, the 2004 Solicitation did not require offerors to provide pricing for using DTS, but indicated that when DTS was available for MEPS requirements, DTS transaction fees would be negotiated. Given the state of DTS in 2004, and the fact that the MEPS contracts were then scheduled to start on April 1, 2005, it was prudent not to solicit or evaluate DTS transaction fees since the Army did not know when DTS would be used for MEPS group travel. Therefore, the MEPS price evaluations were based on the assumption that MEPS services over the next five years would probably be performed entirely with Traditional Travel Service and not with DTS.

71. Experience indicates, however, that this is not in conformity with current reality. The Army's own understanding of the role of DTS in the next several years belies this. In the pending DoD Worldwide Solicitation for travel services which anticipates a start date of October 1, 2007 for contract performance, the Army asks that offerors assume that for pricing purposes, in the first year, there will be no DTS usage without travel counselor assistance — but, in the second and third years, fully automated DTS usage will rise to 10% and 50% respectively.

72. Since the MEPS contracts are now scheduled to also commence on October 1, 2007 and potentially extend for the same five years as the Worldwide Solicitation, it is arbitrary and capricious for the Army to implement performance of contracts awarded on a 2004 Solicitation that contemplated no role for DTS during this same time period. The potential use of DTS for MEPS travel during the period from October 1, 2007 through September 30, 2012 needs to be evaluated and competitive procurements conducted that reflect current plans for the use of DTS for the next five years.

## COUNT III

**(Failure To Provide Critical Information To All Offerors)**

73. Plaintiffs incorporate and reallege each of the allegations in the above paragraphs as if fully set forth herein.

74. Because of the faulty assumptions and outdated requirements used in evaluating the 2004 proposals and making contract awards, other offerors, such as Alexander Travel and El Sol, were and continue to be inherently at a competitive disadvantage.

75. Alexander Travel and El Sol submitted proposals that were based on a Solicitation that did not reflect reality, *i.e.*, commencing performance of MEPS travel service contracts in October 2007 under substantially changed operational and economic requirements and factors.

76. As such, the Solicitation did not enable offerors to compete intelligently and on a relatively equal basis. Doing so was arbitrary and capricious and severely prejudices Alexander Travel and El Sol in violation of the Competition in Contracting Act. Doing so also severely prejudices the Government, since it now proposes to allow performance on contracts with entities whose pricing no longer reflects the illusory cost savings anticipated when the contracts were awarded.

## PRAYER FOR RELIEF

**WHEREFORE,** Alexander Travel and El Sol hereby request this Court to find that the Army engaged in arbitrary and capricious conduct, that the Army must terminate the MEPS contracts awarded to AirTrak, WingGate, and Alamo, and that the Army must conduct a full and open competition for MEPS travel service contracts to commence in 2007.

As a result of the Army's arbitrary and capricious conduct, Alexander Travel and El Sol are rightly entitled to:

(a) A permanent injunction ordering the Army to terminate for convenience the award of any and all contracts issued under Solicitation Number W91QUZ-04-R-0007 to AirTrak, WingGate, and Alamo.

(b) Alternatively, a permanent injunction suspending any contract awarded to AirTrak, WingGate, and Alamo under Solicitation Number W91QUZ-04-R-0007, until such time as the Army has reopened the procurement and revised the Solicitation and conducted a full and open competition for current MEPS travel service requirements in accordance with the above discussion, with specific regard to current requirements for contract period, price, workload, the Service Contract Act, status of DTS and elimination of the unfair equitable adjustment provisions related to fees or payments from GDS vendors.

(c) All costs of attorneys' fees incurred in pursuing this action, in consideration of Plaintiffs' small business size.

(d) Such other relief as the Court may deem just and proper.

Dated: August 17, 2007

Respectfully submitted,

Lars E. Anderson
Peter A. Riesen
Keir X. Bancroft
Patrick R. Quigley
VENABLE LLP
8010 Towers Crescent Drive, Suite 300
Vienna, Virginia 22182
(703) 760-1600 (Telephone)
(703) 821-8949 (Facsimile)

MCDOCS/232763.1

# LIST OF EXHIBITS

EXHIBIT 1:
AGENCY-LEVEL PROTEST OF CONTRACTS AWARDED UNDER SOLICITATION NO. W91QUZ-04-R-007

DATED JUNE 18, 2007

EXHIBIT 2:
ARMY CONTRACTING AGENCY DISMISSAL OF AGENCY-LEVEL PROTEST

DATED JULY 17, 2007

VENABLE LLP

8010 Towers Crescent Drive, Suite 300
Vienna, Virginia 22182-2707

Telephone 703-760-1600
Facsimile 703-821-8949

www.venable.com

Lars E. Anderson
Direct Dial Phone No.: (703) 760-1605
Protected Facsimile No.: (703) 760-1623
E-Mail Address: leanderson@venable.com

June 18, 2007

***VIA HAND-DELIVERY***

Chief Counsel
U.S. ARMY CONTRACTING AGENCY
5109 Leesburg Pike, Suite 302
Falls Church, Virginia 22041-3201

**PROPRIETARY AND CONFIDENTIAL INFORMATION**
**DO NOT DISCLOSE OUTSIDE THE U.S. GOVERNMENT**
**WITHOUT PRIOR WRITTEN APPROVAL**

**Re: MEPS Travel Service Contracts; Executive-Level Agency Protest By CWT/Alexander Travel, LTD And CWT/El Sol Travel, Inc.**

Dear Chief Counsel:

In accordance with Federal Acquisition Regulation ("FAR") Subpart 33.103, 48 Code of Federal Regulations ("C.F.R.") 33.103 (2005), Executive Order 12979 (October 25, 1995), and Army Contracting Agency Acquisition Instruction 5152.233-9000 (April 2004), CWT/Alexander Travel, LTD (hereinafter "Alexander Travel"), 4700 North University Avenue, Peoria, Illinois 61614, telephone no. (309) 693-3511, facsimile no. (309) 693-3520, and CWT/El Sol Travel (hereinafter "El Sol"), 1575 West University Drive, Suite 102, Tempe, Arizona 85281, telephone no. (480) 894-5533, facsimile no. (480) 894-9418, hereby file this Protest under the Army Contracting Agency ("ACA") Executive-Level Agency Protest ("ELAP") Program regarding the award of five contracts by the United States Army (the "Army," the "Government," or the "Agency") under Solicitation Number W91QUZ-04-R-0007 (the

EXHIBIT
1

"Solicitation") to AirTrak Travel ("AirTrak"), WingGate Travel ("WingGate"), and Alamo Travel Group ("Alamo").

**INTRODUCTION**

On February 13, 2004, the Army issued as a small business set-aside Solicitation Number W91QUZ-04-R-0007 for travel management services at various Military Entrance Processing Stations ("MEPS"). MEPS are stations at which military recruits joining the military first report and are sent in groups to military bases to begin basic training. The Solicitation made clear that the Army was requesting MEPS services in six large geographic travel regions of the U.S.

Thereafter, a significant number of offerors submitted proposals for each MEPS region. Final Proposal Revisions ("FPR") were due November 16, 2004. The contracts were to have a firm period of two years and three one-year options. The contracts were to start on April 1, 2005, and expire no later than March 31, 2010. Alexander Travel and El Sol were among those that timely submitted FPRs in response to the Solicitation.

In early 2005, one contract, W91QUZ-05-C-0005 (Travel Area 100), was awarded to AirTrak; two contracts, W91QUZ-05-C-0005 and W91QUZ-05-C-0010 (Travel Areas 101 and 105) were awarded to WingGate; and two contracts, W91QUZ-05-C-0007 and W91QUZ-05-C-0009 (Travel Areas 102 and 104) were awarded to Alamo.[1] Recently, it has been learned that the

[1] Travel Area 103 was awarded to Alexander Travel.

VENABLE LLP



five MEPS travel service contracts awarded to AirTrak, WingGate, and Alamo are scheduled to commence on October 1, 2007.

## PRELIMINARY MATTERS

Alexander Travel and El Sol are interested parties under FAR 33.101, 48 C.F.R. 33.101, for purposes of filing this protest. Alexander Travel and El Sol were offerors under the Solicitation and are prospective offerors whose direct economic interest is affected by the failure to competitively procure MEPS travel service contracts that will not commence until October 1, 2007, or later.

## PARTIES

Alexander Travel and El Sol are experienced Government contractors that specialize in providing travel management services to DoD components and other agencies of the Federal Government.

The Contracting Officer for AirTrak, WingGate, and Alamo contracts is Ms. Sally Williams, U.S. Army Contracting Agency, Information Technology, E-Commerce, And Commercial Contracting Center (ITEC4), 2461 Eisenhower Avenue, Room 984, Alexandria, Virginia 22331-1700; telephone no. (703) 325-1965

## BACKGROUND

In response to the 2004 Solicitation, both Alexander Travel and El Sol expended significant time and funds to provide timely and responsive proposals. Each did so, and each

VENABLE LLP



was evaluated as being technically superior and evidencing a lower performance risk than AirTrak, WingGate, and Alamo. The only alleged advantage that AirTrak, WingGate, and Alamo had over any of the other offerors was that AirTrak, WingGate, and Alamo offered much lower transaction fees. On the basis of those lower fees, the Army awarded contracts to AirTrak, WingGate, and Alamo. It is understood that AirTrak, WingGate, and Alamo have taken advantage of a unique Equitable Adjustment Clause regarding GDS fees to substantially increase their transaction fee prices to levels now above the prices offered by Alexander, El Sol, and other offerors responding to the 2004 Solicitation.

It is understood that, due to exclusive rights to provide travel services to MEPS under pre-existing contracts awarded to CW Government Travel, Inc. ("CWGT"), the contracts awarded to AirTrak, WingGate, and Alamo could not be performed. Alexander and El Sol reasonably assumed that those contracts would be terminated and the MEPS travel service requirements recompeted upon the expiration of CWGT's contracts. Allowing AirTrak, WingGate, and Alamo to commence providing MEPS travel services on October 1, 2007 represents either illegal sole-source contracts or a cardinal change in the contracts awarded under the 2004 Solicitation. Moreover, delaying the start of contract performance two and one-half years later than the dates and pricing required under the Solicitation renders the awards invalid. The apparent decision to negotiate with AirTrak, WingGate, and Alamo on a sole-source basis to

VENABLE LLP



provide MEPS travel services commencing on October 1, 2007 also overlooks the following facts:

- The 2004 Solicitation utilized 2002-2003 workload data for pricing and price evaluation. Actual workload data for Fiscal Year ("FY") 2006 indicates substantial variation from workload data at various MEPS locations used for the 2004 pricing of proposals. Thus, operational and price assumptions used in the Solicitation and award decisions are now invalid.
- The Contract period is for 60 months (24 firm and three 12-month options). The Contract assumed a Contract period of April 1, 2005 to March 31, 2010 for pricing and evaluation purposes. However, the Contract period of 60 months starts whenever service is actually implemented at the first MEPS site within a Travel Area. Since the Contracts are currently scheduled to start on October 1, 2007, they could extend to September 30, 2012, or two and one-half years beyond 2004 price proposals.
- The Solicitation contained several unusual Equitable Adjustment Clauses. AirTrak, WingGate, and Alamo received special payments from one GDS company, Worldspan, which allowed them in 2004 to offer artificially low transaction fees. Since then, Worldspan's special arrangement with AirTrak, WingGate, and Alamo has changed and they have sought, or will seek, much higher transaction fees pursuant to the special

Equitable Adjustment Clause in these contracts. Thus, the sole basis for award to these companies, extraordinarily low transaction fees, is no longer valid.

- MEPS price evaluations were based on the assumption that MEPS would always be performed with Traditional Travel Service and that DTS would not be applicable to MEPS. It is not clear as to the current status of DTS and the probability of its use for MEPS travel in a multi-year contract period commencing on October 1, 2007.
- The Contract is subject to the Service Contract Act. Offerors had to comply with 2004 Department of Labor ("DOL") Wage Determinations for the geographic regions within the Continental United States ("CONUS"). Contract prices are equitably adjusted to reflect subsequent increases in DOL Determinations. Since 2004, there have been significant increases to these DOL Wage Determinations. Thus, the pricing prepared in November 2004, and used for the early 2005 award decisions, is simply no longer valid. AirTrak, WingGate, and Alamo are eligible for substantial price increases before the contracts commence.
- The Solicitation, at § H-4, required offerors to identify Key Personnel and stated that they "are considered critical to the successful performance of this contract." It also required that "this organization shall become effective upon award of the contract and its integrity shall be maintained for the duration of the contract effort." Clearly the identification and

VENABLE LLP



evaluation of key personnel cannot be valid for contracts that commence two and a half years late.

Allowing AirTrak, WingGate, and Alamo to commence performance of five-year MEPS travel service contracts on October 1, 2007, on the basis of proposals and prices submitted in November 2004, is unreasonable and is a clear violation of procurement law and policy. This Protest follows.

## GROUNDS OF PROTEST[2]

### I. THE ARMY'S PROPOSED COMMENCEMENT OF CONTRACTS WITH AIRTRAK, WINGGATE, AND ALAMO FAILS TO CONSIDER THE ARMY'S ACTUAL CONTRACT REQUIREMENTS AND RESULTS IN UNLAWFUL AWARDS

In this case, the Army's 2005 awards to AirTrak, WingGate, and Alamo, based on November 2004 proposals, do not in any way reasonably reflect the Army's actual current requirements. As discussed above, the Solicitation and resulting contracts are not based on the Army's actual needs with regard to the time period for contract performance, workload requirements, or pricing. Because the Government's requirements have changed so fundamentally, the Government has, essentially, unlawfully sole-sourced multiple contracts without maximizing competition among other offerors. Alternatively, because of the magnitude of the changes in requirements since the time the contracts were awarded, the awardees are

---

2 All facts and arguments raised in the previous sections of this Protest are hereby incorporated into the Grounds of Protest as if fully set forth herein.

VENABLE LLP



proceeding with performance on contracts that are subject to cardinal changes that mandate recompetition. In either event, the awardees must not be allowed to proceed with performance and DoD's current requirements for MEPS travel services must be competitively procured.

FAR 15.606 ("Changes in Government requirements") clearly states, "If a change is so substantial that it warrants complete revision of a solicitation, the contracting officer shall cancel the original solicitation and issue a new one, *regardless of the stage of the acquisition*. The new solicitation shall be issued to all firms originally solicited and to any firms added to the original list." FAR 15.606(a)(4) (emphasis added).

The GAO has issued numerous decisions that reflect this concern. For example, the GAO reasoned that 10 U.S.C. § 2304a(b)(3) and FAR 16.504(a)(4)(iii),[3] require solicitations to *reasonably* describe the scope, nature, complexity and purpose of the services being acquired. *See, e.g., Letters to the Air Force and Army Concerning Valenzuela Engineering*, B-277979, Jan. 26, 1998, 98-1 CPD ¶ 51.

Other decisions make the same point even more clearly. In *United Telephone Co. of the Northwest*, B-246977, Apr. 20, 1992, the GAO made clear that FAR 15.606 "requires the government to issue an amendment to a solicitation whenever its requirements change." Later in

---

[3] FAR § 16.504(a)(4)(iii) states that "[a] solicitation and contract for an indefinite quantity must . . . (iii) [i]nclude a statement of work, specifications, or other description, that reasonably describes the general scope, nature, complexity, and purpose of the supplies or services the Government will acquire under the contract in a manner that will enable a prospective offeror to decide whether to submit an offer . . . ."

the same opinion, the GAO stated, "One circumstance requiring the issuance of an amendment is a significant change in the government's quantity requirements." *Id.* (citing *Universal Techs., Inc.*, B-241157, Jan. 18, 1991, 91-1 CPD ¶ 63; *Management Sys. Designers., Inc. et al.*, B-244383.4 *et al.*, Dec. 6, 1991, 91-2 CPD ¶ 518.) It should be noted that, in that case, many months had elapsed between the time that proposals were received and an award was made. The GAO concluded that "the changes identified by [the protester] constitute a significant change from the RFP requirements such that the issuance of an amendment soliciting revised proposals is required."[4] On reconsideration of the same decision, the GAO reiterated: the awardee "chose to proceed to award in the face of an analysis that showed significant variations in the estimated quantities from those on which offerors prepared their proposals. ... While [the Agency and the awardee] argue that they had the discretion to proceed to award, notwithstanding an analysis that reflected changed requirements, an agency may not properly award a contract where its requirements significantly change since this would prejudice other offerors." *Dept of Energy – Request for Recon.; Westinghouse Hanford Co.*, B-246977.2 *et al.*, July 14, 1992 (citing *InterComp Co.*, B-213059, May 22, 1984, 84-1 CPD ¶ 540).

Elsewhere, the GAO has stated, "One circumstance requiring the issuance of an amendment is a significant change in the government's quantity requirements." *See Universal*

---

[4] The fact that years have elapsed since final proposals were submitted and contract awards announced, but contract performance has not started, makes these GAO cases highly relevant.

VENABLE LLP



*Techs., Inc.*, B-241157, Jan. 18, 1991, 91-1 CPD ¶ 63. "Here, there was a significant change in the government's quantity requirements. … These changes should have been communicated to all competitive range offerors through an RFP amendment. [The Agency's] failure to issue such an amendment was contrary to FAR §15.606(a)." *Mgmt. Sys. Designers, Inc; Info. Tech. & Apps. Corp.; Epoch Engineering, Inc.*, B-244383.4 *et al.*, Dec. 6, 1991. Because these changes were not communicated, the GAO found in that case that "[t]his failure may well have been prejudicial to offerors and affected the results of the competition, since offerors might have revised their technical and cost proposals if they had been made aware of the substantial change … For example, offerors knowing that only task A would be funded might have assigned different personnel, not needed for the other tasks, to task A, with the result that technical point scores might have been different." *Id.* In the instant case, the 2004 Solicitation does not come close to reflecting actual requirements and, therefore, commencing contract performance on October 1, 2007 results either in illegal sole-source contracts or contracts fatally flawed by cardinal changes that mandate termination and recompetition.

### A. The Fundamental Change In Contract Requirements Results In An Unlawful Sole-Source Award

Because the Army's needs have so fundamentally changed in this case, allowing the awardees to continue performance of these contracts amounts to illegal sole-source contracts by the Army. The GAO has consistently found that "[t]he overriding mandate of the Competition in

VENABLE LLP



Contracting Act of 1984 (CICA) is for 'full and open competition.'" *See, e.g.*, *Lockheed Martin Sys. Integration – Owego*, B-287190.2, May 25, 2001, 2001 CPD ¶ 110 (sustaining the protest). The GAO therefore will "closely scrutinize sole-source procurements conducted under the exception to that mandate authorized by 10 U.S.C. § 2304(c)(1), which permits an agency to award a sole-source contract where it properly determines that only one responsible source can meet its requirements." *Id.* Accordingly, the GAO has indicated that:

> Our review of an agency's decision to conduct a sole-source procurement focuses on the adequacy of the rationale and conclusions set forth in the J&A. When the J&A sets forth reasonable justifications for the agency's actions, we will not object to the award. On the other hand, where the record shows that the agency has failed to adequately justify its sole-source award decision, we will sustain the protest.

*Id.* The GAO also will sustain a protest when the record reveals that the agency's rationale for awarding a sole-source contract resulted from a lack of advance planning. *HEROS, Inc.*, B-292043, June 9, 2003, 2003 CPD ¶ 111; 48 C.F.R. § 6.301(c) (noting that "[c]ontracting without providing for full and open competition shall not be justified on the basis of . . . a lack of advance planning by the requiring activity").

Here, the Army solicited proposals in 2004 based on one set of contract requirements and assumptions and thereafter awarded contracts based on those requirements and assumptions. However, those contracts could not be performed due to conflicts with pre-existing contracts for

VENABLE LLP



the same requirements. Now, years later, the Army proposes to allow the awardees to commence performance on contracts with substantially different requirements — but without allowing other, more qualified offerors to compete on those requirements. The Army's lack of advance planning has resulted in awards under which performance was not even initiated until two and a half years later. The almost three years that have elapsed between submission of proposals and start of performance of these contracts have rendered invalid both contract requirements and the assumptions under which the 2004 proposal evaluations took place. In this case, the Agency's decision to circumvent full and open competition is unreasonable because more than one source can meet the Agency's actual needs: Alexander Travel and El Sol both submitted proposals that were, because of this passage of time, *in all respects*, more competitive than those submitted by the awardees.

Moreover, the Army has known since 2005 that the MEPS travel service contracts could not be performed by AirTrak, WingGate, or Alamo prior to October 1, 2007, at the earliest. Thus, the Army has had ample time to conduct full and open competitions with qualified small business concerns to provide MEPS travel services upon the expiration of CWGT's Army contracts. There is no legitimate justification for the Army's failure to competitively procure MEPS travel service contracts commencing on October 1, 2007.

VENABLE LLP



**B. In The Alternative, The Fundamental Changes In Contract Requirements Amounted To Cardinal Changes That Required Competition**

Modifications to a contract that exceed the scope of the original contract must be subject to competitive procurement. *See Caltech Serv. Corp.*, 1992 U.S. Comp. Gen. LEXIS 102, *7 (citing *Neil R. Gross & Co., Inc.*, 90-1 CPD ¶ 212 (1990)). Although a court may "carve out" the modification if it merely adds new work, *see CESC Plaza L.P. v. United States*, 52 Fed. Cl. 91, 93 (2002), when a modification materially alters the contract, the entire contract must be subject to competitive bidding. *AT&T v. Wiltel*, 1 F.3d 1201, 1205 (Fed. Cir. 1993).

To determine whether a modification has materially altered a contract, courts should examine whether the "original nature or purpose of the contract is so substantially changed by the modification that the original and modified contract are essentially different." *Ion Track Instr., Inc.*, 90-2 CPD ¶ 31 (1990). In conducting this inquiry, courts have considered factors such as "any changes in the type of work, performance period, and costs between the modification and the prime contract, as well as whether the modification is of a nature that potential offerors would reasonably have anticipated under the changes clause." *Caltech Serv. Corp.*, 1992 U.S. Comp. Gen. LEXIS 102, *7-8 (citing *Amer. Air Filter Co., Inc.*, 78-1 CPD ¶ 136 (1978), aff'd on recon, 78-1 CPD ¶ 443 (1978)).

Here, significant changes have occurred with regard to both the contracts' assumptions and requirements. Further, the modifications to the contracts can in no way be described as

VENABLE LLP



being "of a nature that potential offerors would reasonably have anticipated under the changes clause." As such, if these contracts are not the result of illegal sole-source awards, then they suffer from cardinal changes that require, not mere modification, but a new competitive procurement.

## II. THE ARMY'S PROPOSED COMMENCEMENT OF CONTRACTS WITH AIRTRAK, WINGGATE, AND ALAMO FAILS TO ADEQUATELY CONSIDER CONTRACT PRICE INCREASES

In this procurement, all the awardees were evaluated as having worse technical evaluations and higher performance risk than either Alexander Travel or El Sol.[5] Only one factor was the alleged favorable distinguisher, the one that formed the sole basis for the rationale underlying award to the awardees: price. However, the passage of time since contract awards has proven that the prices offered by AirTrak, WingGate, and Alamo in 2004 are no longer more favorable than those offered by Alexander Travel and El Sol. Price increases now required by AirTrak, WingGate, and Alamo appear to be higher than those offered by Alexander Travel and El Sol in every case. This mandates that contract performance by the awardees must not be allowed. Here, numerous, basic problems exist with the Agency's evaluation of contract price in relation to commencing contract performance on October 1, 2007.

[5] It is understood that several other offerors were also evaluated as technically superior to and with a lower performance risk than AirTrak, WingGate, and Alamo.

VENABLE LLP



A. **No Prices Were Offered For The Latter Half Of Contract Performance**

The 2004 Solicitation did not require that offerors propose pricing for the latter half of the newly proposed performance period (*i.e.*, October 1, 2007 to September 30, 2012). The Solicitation, instead, specified a period of performance starting when service is actually implemented at the first MEPS site within a Travel Area, which was assumed to be April 1, 2005 for each travel area. Since contract awards occurred more than two and a half years ago — and since the awardees are scheduled to perform for five years — the last two and a half years of performance (*i.e.*, April 1, 2010 to September 30, 2012) were not priced by any offerors in the November 2004 FPRs. This means that there is no evaluation of competitive pricing for half the proposed new contracts' term. Moreover, the extraordinary delay in commencing contract performance, coupled with extraordinary Equitable Adjustment Clauses, will result in significantly higher prices for the awardees. As such, commencement of performance on these contracts on October 1, 2007 will undoubtedly be based on sole-source price negotiations with AirTrak, WingGate, and Alamo.

B. **The Contracts' Unique Equitable Adjustment Clauses Have Been Used To Effect Major Changes To Awardees' Offered Prices**

The contracts to provide travel services to the MEPS, as well as other 2004 small business set aside contracts to provide travel services to Air Force bases, contained a unique equitable adjustment clause related to fees received by the contractor from GDS vendors. Such

an equitable adjustment clause had never been used in DoD travel service contracts before or since the 2004 MEPS and Air Force small business travel service contracts. It has been recognized that such an equitable adjustment clause based upon GDS vendor fees created a unique advantage for AirTrak, WingGate and Alamo due to special arrangements they made with one GDS vendor, Worldspan. This unique equitable adjustment clause allowed AirTrak, WingGate and Alamo to "game" the 2004 procurements and offer transaction fees well below market rates. However, such reduced prices and evaluated cost savings for the Government were illusory because after contract awards Worldspan ceased the payments which allowed AirTrak, WingGate, and Alamo to subsequently claim entitlement to substantial increases in transaction fees under the unique equitable adjustment clause.

In fact, it is understood that all the awardees have already taken advantage of the identical equitable adjustment clauses in the Air Force travel service contracts awarded at the same time as the MEPS awards to substantially increase the prices offered in November 2004, which won the contract awards. It is understood that AirTrak, WingGate and Alamo are being paid transaction fees under the Air Force contracts, and would be entitled to similar price increases under the MEPS contracts, at rates now higher than either those proposed by Alexander Travel or El Sol. Thus, in November 2004, AirTrak, WingGate and Alamo offered Transaction Fees ranging from approximately $3.23 to $4.12 to win the contracts. It is believed that due to equitable adjustments, those transaction fees now range from $15.60 to $21. Thus, the

VENABLE LLP



transaction fees that would be paid to AirTrak, WingGate, and Alamo for MEPS travel services commencing in October 2007, would substantially exceed the fees that had been offered by Alexander Travel, El Sol, and other offerors for what would have been the third year (first option year) of the contracts.

The Government's recognition of the unfair advantage that the GDS fee equitable adjustment clause created for the awardees, coupled with the realization that the Government would not realize substantial cost savings, has led to the decision not to use such an equitable adjustment clause in the pending Solicitation for Worldwide DoD travel management services. Having recognized the unfair and illusory competitive advantage created for AirTrak, WingGate, and Alamo in the 2004 Solicitation, it would be unreasonable, to the point of arbitrary and capricious conduct, for the Government to perpetuate this mistake by rewarding those companies with MEPS travel service contracts commencing in October 2007.

**A. Prices And Staffing Offered In 2004 Are Irrelevant To October 2007 Because Of Drastic Alterations To Workload Requirements**

The 2004 RFP contained 2003 workload data for the 57 MEPS sites in Travel Areas 100, 101, 102, 104 and 105. While that workload data may have been adequate for Final Proposal Revisions submitted in November 2004, for contracts commencing on April 1, 2005, it is wholly inadequate for contracts commencing on October 1, 2007. In the pending DOD Solicitation for Travel Services Worldwide, RFP W91QUZ-06-R-0051 (the "Worldwide Solicitation"), the

Government has acknowledged that it is important to provide workload data no older than 12 months when soliciting firm, fixed transaction fees.

A comparison between the 2003 workload data in the 2004 Solicitation that was used to develop pricing with actual 2006 workload data reveals substantial changes in the quantity and geographic location of MEPS workload. This information is broken down by Travel Area below.

*i.* ***Travel Area 100***

At the 7 MEPS sites in this Travel Area, the 2006 actual workload ranges from a decrease of 19% to an increase of 32% in comparison to the 2003 data. For example, in 2003, the workload for the MEPS in Syracuse, New York was 1,416 annual transactions, whereas in 2006, it was 2,091 transactions. Also, in Albany, New York, the MEPS workload in 2003 was 2,553 transactions, whereas in 2006, the workload was only 2,068 transactions.

*ii.* ***Travel Area 101***

At the 10 MEPS sites in this Travel Area, the 2006 actual workload ranges from a decrease of 35%, to an increase of 11%, in comparison to the 2003 data. For example, in 2003, the workload for the Berkley, West Virginia MEPS was 1,163 transactions, whereas in 2006, the actual workload was only 756 transactions. Further, in the Pittsburgh, Pennsylvania MEPS, the 2003 workload data was 3,780 transactions, whereas in 2006, the actual workload was only 2,692 transactions.

VENABLE LLP



*iii. Travel Area 102*

At the 14 MEPS sites in this Travel Area, the 2006 actual workload ranges from a decrease of 43%, to an increase of 44%, in comparison to the 2003 data. There are at least three telling examples: First, in 2003, the workload for Nashville, Tennessee MEPS was 3,022 transactions, whereas in 2006, the actual workload was only 1,661 transactions. Second, in the Memphis, Tennessee MEPS, the 2003 workload data was 1,690 transactions, whereas in 2006, the actual workload was 2,544 transactions. Third, in the San Juan, Puerto Rico MEPS, the 2003 workload data was 2,984 transactions, whereas in 2006, the actual workload was only 2,239 transactions.

*iv. Travel Area 104*

At the 12 MEPS sites in this Travel Area, the 2006 actual workload ranges from a decrease of 71%, to an increase of 31%, in comparison to the 2003 data. This Travel Area also provides numerous clear examples of substantial changes in requirements that would impact an offeror's staffing and pricing. First, the 2003 workload data for the Amarillo, Texas MEPS was 5,514 transactions, whereas the 2006 actual workload data was only 1,619 transactions. Second, in the Albuquerque, New Mexico MEPS, the 2003 workload data was 918 transactions, whereas in 2006, the actual workload data was 1,331 transactions. Third, the 2004 RFP required a fully staffed MEPS in New Orleans to handle 3,000 annual transactions. However, the New Orleans MEPS has been closed since Katrina hit New Orleans.

VENABLE LLP



v. *Travel Area 105*

At the 13 MEPS sites in this Travel Area, the 2006 actual workload ranges from a decrease of 29.5%, to an increase of 69%, in comparison to the 2003 data. Again, numerous specific examples exist to illustrate the changes. For example, the 2003 workload data for the Salt Lake City, Utah MEPS was only 1,130 transactions, whereas in 2006, the actual workload was 3,613 transactions. In the Butte, Montana MEPS, the 2003 workload data was 2,288 transactions, whereas in 2006, the actual workload data was only 1,616 transactions. Finally, in the Los Angeles, California MEPS, the 2003 workload data was 8,063 transactions, whereas in 2006, the actual workload data was only 6,579 transactions.

As a result of these fundamental changes to workload, the staffing resources and prices proposed based on 2003 data are no longer valid in 2007 and beyond. Performance on these 2004 proposals must not be allowed to commence, since awards were made based on staffing allocation and prices that reflect completely inaccurate workload data.

**A. Prices Offered In 2004 Are Not Relevant To October 2007 Because Of Changes To Service Contract Act Wage Determinations By DOL**

DOL Wage Determinations made pursuant to the Service Contract Act of 1965, as amended, have increased substantially for many MEPS sites since the time that contracts were awarded. This may result in substantial price increases under the contracts awarded in early

VENABLE LLP



2005, but would not impact all offerors equally.[6] The 2004 Solicitation incorporated FAR 52.222-41 (Service Contract Act of 1965, As Amended), which required offerors to pay their service employees performing the MEPS travel service requirements compensation at least equal to the DOL wage determinations for the applicable geographic region. Naturally, the Solicitation incorporated the then current wage determinations that generally reflected DOL determinations made in 2003. However, FAR 52.222-41 requires the contractor throughout the contract period to pay its service employees compensation at least equal to *then current* DOL wage determinations. Thus, if a subsequent DOL wage determination increases the compensation required to be paid to any of the contractor's employees in any region, such increased costs may be passed on to the Government.

A comparison of the DOL wage determinations incorporated in the 2004 Solicitation with the current DOL wage determinations incorporated in the DOD Worldwide Travel Services Solicitation W91QUZ-06-R-0051 reveals that since proposals were submitted under the 2004 Solicitation there have been very significant increases in the wages and fringe benefits required by DOL to comply with the Service Contract Act. There has been an increase of 27% in fringe benefits required in DOL wage determinations in all CONUS regions. Set forth below is a

6 The impact of increases in DOL Service Contract Act Wage Determinations, since 2004, could vary significantly between offerors, depending upon the geographic locations being used by individual offerors to provide travel services to the 57 MEPS sites. In these five MEPS regions, only one MEPS site required a staffed CTO at the MEPS. Ironically, that mandatorily-staffed MEPS CTO was in New Orleans and has been closed since Katrina.

VENABLE LLP



sample of basic wage increases at some of the busiest MEPS for "travel clerks I, II &III" under the DOL wage determinations since contracts were awarded under the 2004 RFP:

| **Location** | **Percentage Increase in Wages** |
|---|---|
| Little Rock, AR | over 12.7% |
| Los Angeles, CA | over 11% |
| San Jose, CA | from 17.36% to 21.03% |
| Jacksonville, FL | over 21% |
| Atlanta, GA | over 18% |
| Shreveport, LA | from 14.73% to 18.80% |
| Baltimore, MD | from 13.45% to 22.46% |
| Omaha, NE | over 10% |
| Portland, OR | over 13% |
| Philadelphia, PA | over 9% |
| El Paso, TX | over 18% |
| San Antonio, TX | over 16% |
| Richmond, VA | over 9% |

Thus, in the more than two and a half years' delay in starting performance of the MEPS travel services contracts, there have been very significant cost increases that could potentially be

VENABLE LLP



passed through to the Government before the contracts even start. Conversely, if offerors were preparing proposals currently to start in October 2007, they could structure their proposal to minimize the number of employees required in higher cost areas. As such, Alexander Travel and El Sol were prejudiced by the Army's use of such outdated assumptions, and the awardees must not be allowed to commence performance of service contracts in October 2007 based on prices offered in November 2004.

**B. Contract Prices May Have Changed Because Of The Changing Role of The Defense Travel System**

In 2004, DoD did not know if or when the electronic Defense Travel System ("DTS") would be able to perform the group travel usually required for MEPS. Therefore, the 2004 Solicitation did not require offerors to provide pricing for using DTS, but indicated that when DTS was available for MEPS requirements, DTS transaction fees would be negotiated. Given the state of DTS in 2004, and the fact that the MEPS contracts were then scheduled to start on April 1, 2005, it was prudent not to solicit or evaluate DTS transaction fees since the Army did not know when DTS would be used for MEPS group travel. Therefore, the MEPS price evaluations were based on the assumption that MEPS services over the next five years would probably be performed entirely with Traditional Travel Service and not with DTS.

Experience indicates, however, that this is not in conformity with current reality. The Army's own understanding of the role of DTS in the next several years belies this. In the

VENABLE LLP



pending DoD Worldwide Solicitation for travel services which anticipates a start date of October 1, 2007 for contract performance, the Army asks that offerors assume that for pricing purposes, in the first year, there will be no DTS usage without travel counselor assistance — but, in the second and third years, fully automated DTS usage will rise to 10% and 50% respectively.

Therefore, since the MEPS contracts are now scheduled to also commence on October 1, 2007 and potentially extend for the same five years as the Worldwide solicitation, it is unreasonable for the Army to implement performance of contracts awarded on a 2004 Solicitation that contemplated no role for DTS during this same time period. The potential use of DTS for MEPS travel during the period from October 1, 2007 through September 30, 2012 needs to be evaluated and competitive procurements conducted that reflect current plans for the use of DTS for the next five years.

## III. THE SOLICITATION'S FAILURE TO PROVIDE CRITICAL INFORMATION TO ALL OFFERORS VIOLATES THE COMPETITION IN CONTRACTING ACT

The GAO has consistently found that "[t]he overriding mandate of the Competition in Contracting Act of 1984 (CICA) is for 'full and open competition.'" *Lockheed Martin Systems Integration – Owego*, B-287190.2, May 25, 2001, 2001 CPD ¶ 110 (sustaining the protest). It is well settled that "a procuring agency must provide sufficient information in a solicitation to enable offerors to compete intelligently and on a relatively equal basis." *Braswell Servs. Group, Inc.*, B-278521, Feb. 9, 1998, 98-1 CPD ¶ 49 at 3; *see also Flight Safety Int.*, B-290595, Aug. 2,

VENABLE LLP



2002, 2002 CPD ¶ 138 at 2; *State Mgmt. Servs., Inc.*, B-251715, May 3, 1993, 93-1 CPD ¶ 355 at 5.

As discussed in detail above, because of the faulty assumptions and outdated requirements used in evaluating the 2004 proposals and making contract awards, other offerors, such as Alexander Travel and El Sol, were and continue to be inherently at a competitive disadvantage. Alexander Travel and El Sol submitted proposals that were based on a Solicitation that did not reflect reality, *i.e.*, commencing performance of MEPS travel service contracts in October 2007 under substantially changed operational and economic requirements and factors. As such, the Solicitation did not, per *Braswell*, *supra*, "enable offerors to compete intelligently and on a relatively equal basis." Doing so not only severely prejudices Alexander Travel and El Sol, but also the Government, since it now proposes to allow performance on contracts with entities whose pricing no longer reflects the illusory cost savings anticipated when contracts were awarded.

**CONCLUSION**

In 2004, the Army issued a Solicitation for five years of MEPS travel services to commence on April 1, 2005. The offerors' proposals were based on 2003 workload factors and then-current economic factors that are simply not relevant to contracts commencing in October 2007. Moreover, the contract awards were made to low rated technical and medium risk offerors because of the unrealistic low prices that have or will disappear due to the defective GDS fee

equitable adjustment clause. Alexander Travel and El Sol demonstrated clear superiority in both technical and performance risk factors over AirTrak, WingGate, and Alamo. Moreover, the prices that Alexander Travel and El Sol offered would not have increased due to escalation for GDS fees. It is incumbent on the Army to terminate the MEPS contracts awarded to AirTrak, WingGate, and Alamo and conduct a full and open competition for MEPS travel service contracts to commence in 2007.

**REQUEST FOR INDEPENDENT REVIEW OF THIS PROTEST**

In accordance with FAR 33.103(d)(4), Alexander Travel and El Sol respectfully request "an independent review of [its] protest at a level above the contracting officer…" FAR 33.103(D)(4).

**REQUEST FOR HEARING/MEETING**

As set forth above, by allowing contract performance to begin almost three years after receipt of proposals, Alexander Travel and El Sol request a hearing to fully investigate the resulting problems and inequities. In addition, Alexander Travel and El Sol respectfully request the Army to promptly provide the following under protective order:

(a) Unredacted copies of all evaluation and source selection documents prepared under the 2004 Solicitation.

(b) All documents related to communications between the Government and AirTrak, WingGate, and Alamo, or their representatives regarding the delay in commencing performance beyond April 1, 2005, and any contract modifications that have been implemented, or would be necessary due to events after contract award, including commencement of the contracts on October 1, 2007.

(c) All documents related to, or reflecting any requests for equitable adjustments in pricing requested by AirTrak, WingGate, or Alamo, or their representatives, under the MEPS contracts or Air Force travel contracts awarded under another 2004 Solicitation with identical equitable adjustment provisions.

It is requested that the Army take the following action:

(d) Terminate for convenience any contract awarded to AirTrak, WingGate, and Alamo under the 2004 Solicitation and conduct full and open competitions for current MEPS travel service requirements.

(e) Alternatively, suspension by the Army of any contract awarded to AirTrak, WingGate, and Alamo under the 2004 Solicitation, until such time as the Army has reopened the procurement and revised the Solicitation in accordance with the above discussion, with specific regard

VENABLE LLP



to current requirements for contract period, price, workload, the Service Contract Act, status of DTS and elimination of the unfair equitable adjustment provisions related to fees or payments from GDS vendors.

(f) Best efforts to resolve this Agency Protest within 35 days after the Protest is filed, pursuant to FAR 33.103(g).

(g) Review of this Protest at a level above the contracting officer, as required to be available by FAR 33.103(d)(4).

(h) The convening of a hearing or other appropriate meeting to facilitate resolution of this Protest.

(i) A ruling sustaining this Protest, as contemplated by FAR 33.103(d)2)(v).

(j) The prompt release of required and/or procurement sensitive information.

(k) Such other and further relief as is just and proper.

VENABLE LLP



Respectfully submitted,

Lars E. Anderson
Peter A. Riesen
VENABLE LLP
8010 Towers Crescent Drive, Suite 300
Vienna, Virginia 22182
(703) 760-1600 (Telephone)
(703) 821-8949 (Facsimile)

*Counsel to Protesters CWT/Alexander Travel, LTD and CWT/El Sol Travel*

*LEA/kws*

cc: Ms. Sally Williams *(via e-mail @ Sally.Williams@us.army.mil and U.S. Mail)*

MC1DOCS1/228858.02

DEPARTMENT OF THE ARMY
OFFICE OF THE ASSISTANT SECRETARY OF THE ARMY
ACQUISITION LOGISTICS AND TECHNOLOGY
US ARMY CONTRACTING AGENCY
5109 LEESBURG PIKE SUITE 302
FALLS CHURCH VA 22041-3201

JUL 17 2007

Office of the Chief Counsel

Lars E. Anderson, Esq.
Venable LLP
8010 Tower Crescent Drive, Suite 300
Vienna, Virginia 22182-2707

Dear Mr. Anderson:

I am the Deputy Chief Counsel for the Army Contracting Agency (ACA) and am providing the decision memo of the Army Contracting Agency (ACA) Executive-Level Agency Protest Program in accordance with the procedures established under Subsection 5133.103-91 of the ACA Acquisition Instruction dated August 2006.

Enclosed is the decision that dismisses your protest.

Sincerely,

Duane Zezula
Deputy Chief Counsel
U.S. Army Contracting Agency

Enclosure

DEPARTMENT OF THE ARMY
OFFICE OF THE ASSISTANT SECRETARY OF THE ARMY
ACQUISITION LOGISTICS AND TECHNOLOGY
US ARMY CONTRACTING AGENCY
5109 LEESBURG PIKE SUITE 302
FALLS CHURCH VA 22041-3201

# DECISION

Protest of: CWT/ALEXANDER TRAVEL, LTD & CWT/EL SOL TRAVEL, INC.

File: C-000015.1
Solicitation No. W91QUZ-04-R-0007
Alexandria, Virginia

Date: 17July 2007

---

Lars E. Anderson, Esq., Peter A. Riesen, Esq., Venable LLP, for the protesters.

Gregory A. Moritz, Esq., Robert E. Dudley, Jr., Esq., Patrick C. Drury Esq., Information Technology, E-Commerce and Commercial Contracting Center, Alexandria, Virginia, for the agency.

---

The protest of CWT/ALEXANDER TRAVEL, LTD and CWT/EL SOL TRAVEL, INC. (Alexander and El Sol) relates to the award of five contracts under Solicitation No. W91QUZ-04-R-0007 (Solicitation), issued by the Information Technology, E-Commerce and Commercial Contracting Center (ITEC-4), Alexandria, Virginia, which is part of the U.S. Army Contracting Agency (ACA), and was filed pursuant to the ACA's Executive Level Agency Protest (ELAP) procedures. The Solicitation contemplated the award of six fixed-price contracts, each for a base period of two years with three one-year options, to provide official travel management and related services on a point-of-sale basis for authorized Department of Defense (DOD) travelers for six travel areas that collectively incorporated sixty-seven (67) Military Entrance Processing Stations (MEPS) locations, identified as travel areas 100 through 105.[1] Each of the six travel areas was competed separately, and the Government awarded a contract for each travel area pursuant to the Solicitation. Since each travel area was solicited and evaluated separately, six source selection decisions were made.[2] Awards for Travel Areas 100, 101, 102, 104, and 105 were made on 17 March 2005, 1 February 2005, 1 March 2005, 1 March 2005, and 1 February 2005, respectively. Due primarily to a settlement agreement filed with the U.S. Court

---

[1] This protest does not involve the MEPS contract for Travel Area 103, which was awarded to one of the protesters, namely Alexander Travel.

[2] El Sol did not submit a proposal for Travel Areas 100 and 101, but did for Travel Areas 102, 104, and 105. Alexander Travel submitted proposals for Travel Areas 100, 101, 102, 104, and 105.

EXHIBIT

of Federal Claims (COFC) involving Alexander's and El Sol's counsel, no performance under the protested MEPS contracts has commenced. However, it is anticipated that performance will begin on these contracts on or about 1 October 2007. The protesters assert that "[a]llowing [the contractors] to commence performance of five-year travel service contracts on October 1, 2007, on the basis of proposals and prices submitted in November 2004, is unreasonable and is a clear violation of procurement law and policy."

The protest includes three major grounds. First, it alleges that the Army's proposed commencement of contracts with the contractors fails to consider the Army's actual contract requirements and results in unlawful awards. Second, the protest alleges that the Army's proposed commencement of contracts with the contractors fails to adequately consider contract price increases. Third, it asserts that the Solicitation failed to provide critical information to all offerors in violation of the Competition in Contracting Act.

For the reasons explained below, the protest is dismissed because it fails to set forth information establishing the timeliness of the protest. Furthermore, the protest appears to be untimely on its face.

A protest under the ACA's ELAP procedures is a "protest to the agency" in accordance with FAR 33.103.[3] FAR 33.103, Protests to the Agency, subparagraph (d)(1), states that failure to comply with the procedures listed under subparagraph (d)(2) "may be grounds for dismissal of the protest." Procedure (d)(2)(viii) states that protests shall include "all information establishing the timeliness of the protest."[4] Despite this mandatory requirement, the protesters failed to include such information. Indeed, the protest does not assert or otherwise provide any information to establish that its allegations are timely.[5]

Furthermore, the protest appears to be untimely on its face. FAR 33.103(e) provides that "[p]rotests based on alleged apparent improprieties in a solicitation shall be filed before bid opening or the closing date for receipt of proposals. In all other cases, protests shall be filed no later than 10 days after the basis of protest is known or should have been known, whichever is earlier."

---

[3] Army Contracting Agency (ACA) Acquisition Instruction (AI), August 2006, section 5133.103-91(c)(1).

[4] The requirement to include information establishing the timeliness of a protest is not unique to protests to an Agency. Pursuant to 4 CFR §21.1(c)(6), protests to the Government Accountability Office (GAO) must also "set forth all information establishing the timeliness of the protest." Failure to set forth such information is grounds for dismissal of a GAO protest. See, for example, *Consolidated Management Services, Inc. -- Reconsideration*, B-270696.2, B-270696.3, Feb. 13, 1996, 96-1 CPD P 76.

[5] FAR 33.103(e) permits an agency to consider untimely protests. "The agency, for good cause shown, or where it determines that a protest raises issues significant to the agency's acquisition system, may consider the merits of any protest which is not timely filed." However, the protesters do not assert that there is good cause to consider this untimely protest nor have the protesters raised any issues of significance to warrant consideration of this untimely protest.

The closing date for the Solicitation has long since passed and the most recent contract award, made for Travel Area 100 on 17 March 2005, occurred twenty-seven (27) months before the protest was filed. Many of the protesters' objections appear to constitute objections to the terms of the Solicitation and/or the award of these MEPS contracts. Clearly, those objections are untimely under the timeliness standards of FAR 33.103. To the extent the protesters are objecting to post-award actions, actually taken or potentially to be taken[6], these objections are also clearly untimely. The objections to these post-award actions are characterized by protesters as objections to the commencement of performance, under the protested contracts, on 1 October 2007, because of the substantial time since award. These objections are untimely under FAR 33.103 since it appears the protesters knew or should have known of the delay to the start of performance more than 10 days before this protest was filed. Page four of the protest alleges "[i]t is understood that, due to exclusive rights to provide travel services to MEPS under pre-existing contracts awarded to CW Government Travel, Inc. ("CWGT"), the contracts awarded to AirTrak, WingGate, and Alamo could not be performed." The protest further alleges on page twelve "[m]oreover, the Army has known since 2005 that the MEPS travel service contracts could not be performed by AirTrak, WingGate, or Alamo prior to October 1, 2007, at the earliest." It is apparent that these allegations are referring to the complaint filed in the COFC by CWGT in which CWGT alleged that it is the exclusive provider for the MEPS locations in Travel Areas 100, 101, 102, 104, and 105. See CW Government Travel, Inc. v. United States, 63 Fed. Cl. 369 (2004). This dispute was settled by the parties pursuant to an agreement dated 10 June 2005. Consequently, the protesters, through their counsel, knew or should have known about the delay in the start of performance of the MEPS contracts since 2005[7]; these objections, therefore, also are untimely under FAR 33.103.

Accordingly, the protest is dismissed.

Scott E. Lind
Colonel, U.S. Army
Chief Counsel

---

[6] Virtually all of the post-award actions identified in the protest either have not occurred yet, or will never occur.

[7] The protesters' counsel, Mr. Lars Anderson, of Venable LLP, was also the counsel for CWGT in connection with this COFC complaint and its settlement. As counsel for CWGT, he negotiated the settlement agreement between the Government and CWGT.