**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**BID PROTEST**

| | |
|---|---|
| **CWT/ALEXANDER TRAVEL, LTD,** | |
| **and** | |
| **CWT/EL SOL TRAVEL, INC.,** | **Case No. 07-612** |
| **Plaintiffs,** | **Judge Nancy B. Firestone** |
| **v.** | |
| **THE UNITED STATES,** | |
| **Defendant.** | |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF**
**MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD**

Lars E. Anderson
VENABLE LLP
8010 Towers Crescent Drive, Suite 300
Vienna, Virginia 22182
(703) 760-1600 (Telephone)
(703) 821-8949 (Facsimile)
(703) 760-1623 (Protected Facsimile)
*Attorney of Record*

*Of Counsel:*
Peter A. Riesen
Keir X. Bancroft
Patrick R. Quigley
VENABLE LLP
8010 Towers Crescent Drive, Suite 300
Vienna, Virginia 22182
(703) 760-1600 (Telephone)
(703) 821-8949 (Facsimile)
(703) 760-1623 (Protected Facsimile)

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..... iii

QUESTIONS PRESENTED ..... 1

STATEMENT OF THE CASE ..... 1

STATEMENT OF FACTS ..... 6

A. Solicitation ..... 6

B. Offers and Evaluations ..... 11

C. AirTrak Contract ..... 12

D. WingGate 101 Contract ..... 13

E. Alamo 102 Contract ..... 13

F. Alamo 104 Contract ..... 14

G. WingGate 105 Contract ..... 15

H. Previous Protest & Settlement Agreement ..... 16

I. Prices ..... 16

ARGUMENT ..... 17

A. Jurisdiction and Standard of Review ..... 17

1. Court Of Federal Claims Has Jurisdiction Over Post-Award Bid Protests ..... 17

2. Judgment On The Administrative Record Is Appropriate Under RCFC 52.1 ..... 18

B. This Procurement Violates the Law, and That Violation Has Harmed Plaintiffs ..... 18

1. Government Has Failed To Consider Its Actual Contract Requirements ..... 19

a. Government's Failure to Re-Compete Contracts Represents Cardinal Change When Contract Start Dates Are So Delayed That Half the Original Contract Period Has Already Passed ..... 21

(1) The changes in workload requirements and cost factors since the 2004 procurement do not affect all offerors equally ..... 23

(2) The Government appears to have waived contract requirements for the benefit of the awardees ........ 24

b. Alternatively, Fundamental Change in Contract Requirements in Form of Lengthy Delay in Start of Performance Has Resulted in Unlawful Sole Source Procurement ........ 25

2. Government Has Failed To Adequately Consider Contract Price Increases ........ 27

3. Government Has Failed To Provide Critical Information To All Offerors ........ 28

C. The Court Should Grant Plaintiffs' Motion for Injunctive Relief and Either Terminate the Awards for Convenience or Re-open the Procurement ........ 30

1. Plaintiffs Will Suffer Irreparable Harm If Awardees Are Allowed To Commence Performance Of The Awarded Contract ........ 30

2. The Harm To Plaintiffs Outweighs Any Potential Harm To The Awardees ........ 31

3. Granting Injunctive Relief Is Strongly In The Public Interest ........ 32

CONCLUSION ........ 33

# TABLE OF AUTHORITIES

**Cases**


Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054 (Fed. Cir. 2000) ........ 29
*Al Ghanim Combined Group Co. v. United States.*, 56 Fed. Cl. 502 (2003) ........ 32, 33
*Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359 (1998) ........ 17
*AT&T Communications, Inc. v. Wiltel, Inc.*, 1 F.3d 1201 (Fed. Cir. 1993) ........ 18, 21
*Bannum, Inc. v. United States*, 404 F.3d 1346 (Fed. Cir. 2005) ........ 18, 29
*Cardinal Maint. Serv., Inc. v. United States*, 63 Fed. Cl. 98 (2004) ........ passim
*Clean Giant, Inc. v. United States*, 19 Cl. Ct. 390 (1990) ........ 19
*CW Gov't Travel, Inc. v. United States*, 61 Fed. Cl. 559 (2004) ........ 18, 22
*Dairy Maid Dairy v. United States*, 837 F. Supp. 1370 (E.D. Va. 1993) ........ 32
*DynCorp Intern. LLC v. United States*, 76 Fed. Cl. 528 (2007) ........ 18
*Gentex Corp. v. United States*, 58 Fed. Cl. 634 (2003) ........ 31
Geo-Seis Helicopters, Inc. v. United States, 77 Fed. Cl. 633 (2007) ........ 29
*Int'l Res. Recovery, Inc. v. United States*, 60 Fed. Cl. 1 (2004) ........ 30
*J & H Reinforcing and Structural Erectors v. United States*, 50 Fed. Cl. 570 (2001) ........ 31
*Krygoski Constr. Co., Inc. v. United States*, 94 F.3d 1537 (Fed. Cir. 1996) ........ 19
*Lion Raisins, Inc. v. United States*, 52 Fed. Cl. 115 (2002) ........ 30
*Long Island Savings Bank, FSB v. United States*, --- F.3d ---, No. 2006-5029, slip op. (Fed. Cir. Sept. 13, 2007) ........ 19
*Magnavox Electronic Sys. Co. v. United States*, 26 Cl. Ct. 1373 (1992) ........ 30, 31
*Max Drill, Inc. v. United States*, 427 F.2d 1233 (Ct. Cl. 1970) ........ 22
*Minor Metals, Inc. v. United States*, 38 Fed. Cl. 16 (1997) ........ 33
*MVM, Inc. v. United States*, 46 Fed. Cl. 137 (1999) ........ 31, 32
*Nutech Laundry & Textile, Inc. v. United States*, 56 Fed. Cl. 588 (2003) ........ 17
*Overstreet Elec. Co. v. United States*, 47 Fed. Cl. 728 (2000) ........ 31
*PGBA, LLC v. United States*, 57 Fed. Cl. 655 (2003) ........ 30
*Seattle Sec. Servs., Inc. v. United States*, 45 Fed. Cl. 560 (2000) ........ 31
*TRW Envtl. Safety Sys., Inc. v. United States*, 18 Cl. Ct. 33 (1989) ........ 31
*United Int'l Investigative Servs., Inc. v. United States*, 41 Fed. Cl. 312 (1998) ........ 30
*United Payors & United States Providers Health Servs., Inc. v. United States*, 55 Fed. Cl. 323 (2005) ........ 30
*Wetsel-Oviatt Lumber Co. v. Untied States*, 43 Fed. Cl. 748 (1999) ........ 31
*Zoubi v. United States*, 25 Cl. Ct. 581 (1992) ........ 19


**Statutes**


10 U.S.C. § 2304 ........ 26
28 U.S.C. § 1491 ........ 17
41 U.S.C. § 253 ........ 18
5 U.S.C. § 706 ........ 17
5 U.S.C. §§ 701-06 ........ 17


**Other Authorities**


RESTATEMENT (SECOND) OF CONTRACTS § 33 (1992) ........ 19

**Rules**

RCFC 52.1 .......... 18

**Regulations**

FAR 1.102 .......... 29
FAR 16.202-2 .......... 19
FAR 6.302 .......... 26
FAR 6.302-2 .......... 26

**GAO Decisions**

*AAA Eng'g & Drafting, Inc.*, B-236034.2, 92-1 CPD ¶ 307 (Mar. 26, 1992) .......... 23
*Defense Sys. Group*, B-240295, 1990 WL 293,536 (Nov. 6, 1990) .......... 22, 23
*Ingersoll-Rand*, B-225996, 87-1 CPD ¶ 474 (May 5, 1987) .......... 22
*K-Whit Tools, Inc.*, B-247081, 92-1 CPD ¶ 382 (Apr. 22, 1992) .......... 26
*Neil R. Gross & Co.*, B-237434, 90-1 CPD ¶ 212 (Feb. 23, 1990) (citations omitted), *aff'd on reconsideration*, B-237434.2, 90-1 CPD ¶ 491 (May 22, 1990) .......... 21, 22
*WorldWide Language Resources, Inc.*, B-296984, 2005 CPD ¶ 206 (Nov. 14, 2005) .......... 26

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD**

Pursuant to Rule 52.1(b) of the Rules of the United States Court of Federal Claims ("RCFC"), Plaintiffs CWT/Alexander Travel, LTD ("Alexander Travel"), and CWT/El Sol Travel, Inc. ("El Sol"), by their undersigned counsel, have respectfully moved in the accompanying Motion for Judgment on the Administrative Record.

**QUESTIONS PRESENTED**

Whether five-year contracts that were procured in 2004, based upon 2002-2003 workload data and requirements, and awarded in early 2005, can be changed to commence half-way through the original performance period, *i.e.*, two and one-half years late, and extend two and one-half years beyond the period in which competitive prices were offered, or whether the Government must competitively re-procure the contracts based on current requirements?

**STATEMENT OF THE CASE**

Plaintiff has provided a detailed statement of facts based upon the limited record produced by the Government. It is noted, however, that the Administrative Record produced to date by the Government does not include any existing documentation reflecting the Government's decision-making process on the changes made to these contracts to delay commencement of the contracts by two and one-half years. Nor does the record contain any existing documentation regarding the Government's identification or consideration of how current requirements have changed since the FY 2003 workload requirements upon which the 2004 procurement were premised. The Government has also failed to produce existing documentation reflecting additional changes that have been identified to date as necessary due to the two and one-half years' delay in commencing performance or due to extending the total contract period two and one-half years beyond the competitive pricing solicited. The

Administrative Record fails to produce even the most fundamental documents reflecting the communications/negotiations that have occurred between the Government and the awardees since the 2005 award of the original contracts. Thus, Plaintiffs' Motion for Judgment and any decision rendered by this Court will be based on a woefully incomplete Administrative Record.[1]

In 2004, the Government sought to competitively procure travel management services for the 54 Military Entrance Processing Stations ("MEPS"), located in thirty (30) states and Puerto Rico, that are included in the five contracts at issue. Each of these contracts required travel services to multiple MEPS sites spread over multiple states and time zones. The Government provided extensive workload requirements for each individual MEPS based on FY 2003 historical data, plus Department of Labor ("DOL") wage determinations. The 2004 Solicitation provided 2003 DOL wage determinations for each MEPS site and required compliance with the Service Contract Act.

With one exception, each offeror could determine how to service the MEPS within a Travel Area and where to locate contractor personnel, equipment and facilities to perform the contract. The exception was a requirement that the New Orleans MEPS in Travel Area 104 be serviced via a staffed, on-site Commercial Travel Office ("CTO").[2] However, since offerors

---

1 It is noted that identical issues were raised by Plaintiffs in Agency Level Protests filed in June 2007, after learning that the Government did intend to commence performance of the contracts procured in 2004 on October 1, 2007. Thus, the Government has had months to identify and assemble relevant documents that reflect the Government's decision-making process and communications with the awardees. The Government's deliberate withholding of such relevant documentation from the Administrative Record should be accorded an adverse inference.

2 Such on-site CTOs are expensive and undoubtedly would have also been used to serve some of the other MEPS within Travel Area 104. However, it is noted that since Hurricane Katrina, the New Orleans MEPS CTO has been closed. This represents a significant change in requirements and cost under Travel Area 104.

were generally free to locate their staff anywhere within the continental United States, they had to comply with the DOL wage determination that was applicable for their individual geographic locations. Thus, the significant increases in DOL wage determinations that have occurred in some regions since 2003 will impact the offerors uniquely, and it cannot be assumed that labor costs in all the 2004 offers would have increased the same for contracts commencing on October 1, 2007, and extending through September 30, 2012.

Since offerors in the 2004 procurement each had unique facilities and resources to perform within each Travel Area, each would be affected differently by changes in workload and cost factors. Thus, changes in workload that represent increases or decreases in travel volume from different MEPS sites within a Travel Area could impact an offeror's costs, even though the change in total volume for the Travel Area may not exceed 20 percent. Changes in workload requirements at each MEPS could also impact offerors differently, depending upon how they had planned to provide the travel services. The very fact that it was necessary in the 2004 procurement to provide offerors with the very detailed workload requirements for each individual MEPS site illustrates that such information is crucial for offerors to prepare adequate technical and price proposals.

A review of the extensive and detailed information contained in the 2004 Solicitation (AR 168-219, 340-1065) to enable offerors to determine the personnel, equipment and physical resources needed to adequately service each MEPS site and develop reasonable and accurate fixed prices illustrates that changes to the factors described above during the past three years have a significant impact. There have also been significant changes in technology, equipment and physical facilities available to commercial travel service providers and offerors since November 2004. In 2004, the Government's own automated travel system, Defense Travel

System ("DTS), was under development and then projected as two years away from being available for utilization by the MEPS. The current status of the DTS and schedule for utilization by the MEPS is unknown, but when it is implemented, it will have a profound impact on the method and cost of providing travel services. Such commercial and Governmental technology changes could have a dramatic and different impact on each of the 2004 offerors' cost to perform travel services for the MEPS from October 1, 2007 through September 30, 2012.

The Court cannot simply assume that whatever changes in requirements, workload, labor wages and other cost factors that have occurred since November 2004 would have effected all the offerors equally by October 1, 2007 and through September 30, 2012. That is why it is necessary to have the Government provide a complete record, so the significance of the changes since 2004 may be adequately assessed.

Offerors were required to provide firm, fixed prices based on such workload requirements that would be in effect from the projected performance start date of April 1, 2005, through the end of the last option year on March 31, 2010. In early 2005, the Government awarded the five contracts protested here, but due to delay resulting from a number of Small Business Administration ("SBA") size protests and/or Government Accountability Office ("GAO") bid protests, the executed contracts in early 2005 established October 1, 2005 as the performance commencement date.[3]

The Government knew, or should have known, that at the time it issued the small business set-aside Solicitation in 2004 for travel management services, DoD contracts

3 It is not uncommon for there to be three to six months delay in commencement of DoD travel service contracts in order to resolve any bid protests. If the commencement of these contracts had only been delayed six months, Plaintiffs would not consider such a delay to be a cardinal change.

competitively procured and awarded in 2002 provided a large business contractor, CW Government Travel, Inc. ("CWGT") with the exclusive right to provide travel management services to 54 of the MEPS sites through its entire contract period, including options, until September 30, 2007.[4] Litigation between CWGT and the Government was settled on June 10, 2005, and the Government knew it would be unlikely to change contractors providing travel services to these MEPS sites prior to October 1, 2007. However, rather than competitively procure follow-on contractors to succeed the expiration of CWGT's contracts, the Government secretly entered into a series of sole-source extensions of the five contracts.

Now, nearly two and one-half years after the 2004 procurement contract start dates – half-way through the original five-year performance period, and six months after the expiration of the original two-year firm, fixed-price base period – the Government intends to go ahead with a three-year-old unconsummated procurement based on three-year-old prices and even older workload requirements. This the Government cannot do. The extraordinary delay in commencing performance and extending the total contract period 50 percent beyond the period for which competitive pricing was sought constitutes a cardinal change. Though prudence and good contract management practices alone would surely counsel re-procurement at this late date, the law requires it, and Plaintiffs will demonstrate in this memorandum why.

---

4 It is understood that the Government is currently negotiating up to a six-month extension of the CWGT contracts, so there is no danger that travel management service for the MEPS would terminate on September 30, 2007, if the Government is required to competitively procure small business follow-on contractors.

## STATEMENT OF FACTS

### *A. Solicitation*

On February 13, 2004, the United States Army (the "Army," the "Agency," or the "Government") issued as a small business set-aside Solicitation Number W91QUZ-04-R-0007 (the "Solicitation") for travel management services at various MEPS, the stations at which military recruits joining the military first report and are sent in groups to military bases to begin basic training. AR at 3-219, 222-66.[5] The Government expressed its intention in the Solicitation to make multiple awards to cover six defined travel areas, all of which would be set aside for small businesses. *Id.* at 142. The Solicitation included the travel management service requirements for 67 MEPS sites divided into six regional groups. Travel Area 100 included seven MEPS sites located in New York, Massachusetts and Maine; Travel Area 101 included ten MEPS sites located in Virginia, Maryland, Pennsylvania, New Jersey, Ohio, West Virginia and Missouri; Travel Area 102 includes 14 MEPS sites located in Puerto Rico, Florida, South Carolina, Georgia, North Carolina, Alabama, Mississippi, Tennessee and Missouri; Travel Area 103[6] included nine MEPS sites located in Iowa, Illinois, Minnesota, Michigan, Wisconsin, North Dakota and South Dakota; Travel Area 104 includes 13 MEPS sites located in Colorado, New Mexico, Arkansas, Oklahoma, Louisiana and Texas; Travel Area 105 includes 13 MEPS sites located in Arizona, Utah, Idaho, California, Washington, Oregon, Montana, Alaska and Hawaii. *Id.* at 340-41, 3143-44.

---

5 Plaintiffs have adopted the Administrative Record citation convention used by the Government in prior motions, *i.e.*, citing to the specific Bates numbers of pages in the record.

6 Awarded to CWT Alexander Travel and not involved in this Protest.

The Solicitation was for a firm, fixed-price contract with a 24-month base period and three one-year options. AR at 5. The base ordering period was to begin "with the issuance of a contract modification for commencement of services." *Id.* Price quotes were required for traditional travel services and transaction fees and related costs. *Id.* at 5-92. The transaction fee is the fee charged by the contractor for one DoD travel authorization, which includes all travel arrangements including en route assistance. *Id.* at 338.

The Solicitation stated that the travel management services would be provided using both traditional methods and automated methods using the web portal, AR at 93, however the Solicitation requested no price data for DTS services, *see id.* at 5-92, 153. The Solicitation provided that "at this time" group travel of ten or more travelers "cannot be processed through [the] DTS." *Id.* at 179, 204. Offerors were informed that "sufficient information on booking MEPS travel is not currently available to aid all offerors in developing realistic DTS transaction fees." *Id.* at 211. Offerors were informed that "once DTS functionality becomes available, the travel request will be initiated by the MEPS travel clerk within DTS." *Id.* at 200. Offerors were informed that when a system functionality for booking groups with DTS becomes available, the Government will negotiate a separate fee for group bookings. *Id.* at 172. Offerors were informed that "the requirement to book MEPS through DTS will remain in the RFP. However, until such time that DTS functionality becomes available, MEPS transactions will be handled using traditional methods only. DTS transaction fees will be negotiated in the base year two of the contract." *Id.* at 203, 206, 211. The Solicitation indicated that the automated DTS would commence deployment to MEPS sites in each Travel Area during Fiscal Year 2006. *Id.* at 159, 340-41. Unlike traditional travel services, the DTS is conceived of as an integrated process

comprised of traditional travel services and end-to-end systems that achieve a seamless, paperless travel process through automation. *Id.* at 331.

Section H-42 of the Solicitation required offerors to identify the "key personnel considered to be critical to the successful performance of this contract." AR at 180. The Solicitation also required that "at least 50% of the cost of contract performance incurred for personnel shall be expended for employees of the concern [offeror]." *Id.* at 205. The Solicitation, with one exception, did not require that offerors provide on-site staffing at any MEPS location in Travel Areas 100, 101, 102, 104 and 105. The exception was that the MEPS site in New Orleans was required to be serviced by an on-site staff. *Id.* at 341. However, the New Orleans MEPS has remained closed since Hurricane Katrina.

Article G20 of the Solicitation contained an equitable adjustment clause that provided for changing the contract price in the event that the number of total transactions for an entire Travel Area varied by more than 20 percent over the estimated quantity. AR at 121-22. This 20 percent variance would be "based on the FY03 air/ticket volume." *Id.* at 189.

Initial Offers were due on June 14, 2004. AR at 1, 143. The Solicitation was amended a total of 10 times and Final Proposal Revisions were requested on November 19, 2004. *Id.* at 3139-40. The Solicitation provided extensive workload data to be used by offerors to prepare their fixed price proposals. *Id.* at 340-481. Workload estimates were based on FY-2003 data. *Id.* at 153, 194. The workload data included the number of tickets issued for each of the 67 MEPS locations in FY2003, *id.* at 340-41, and estimates of the number of tickets to be issued from April 2005 through March of 2010, along with the estimated military population at each MEPS site, *id.* at 342-49. The Solicitation, based on FY 2003 historical data, provided offerors with the top ten origin and destination cities for air travel for the DoD travelers from each MEPS

site. *Id.* at 350-481. Thus, for example, offerors were informed which airport travelers from a particular MEPS usually departed and the most frequent destination airports. *Id.* The Solicitation provided offerors information regarding the percentage of travel at each MEPS location involving transactions utilizing either Centrally Billed Accounts or Individually Billed Accounts or Government Transportation Requests. *Id.* Each method of payment required different recordkeeping and reporting for the contractor. *Id.* at 320-22.

Proposed prices submitted in response to the Solicitation were to be evaluated based on the anticipated beginning date of the first travel services and ending 60 months later. AR at 165. Section L of the Solicitation provided that the Price Evaluation period for this acquisition begins with the "anticipated date of first travel services site implementation within a travel area. The evaluated contract life is 60 months, beginning with the first travel services site implementation within a Travel Area, and ending 60 months thereafter. See Section J, Attachment 9, Technical Exhibit A for the anticipated date of the first date of the first travel services site within each travel area." *Id.* at 153-54. Attachment 9, Technical Exhibit A provided that the anticipated first date of the travel services within each MEPS Travel Area was April 1, 2005. *Id.* at 340-41.

At the time offers were submitted, the planned start date for the contracts, and the date upon which price offers were based, was April 1, 2005. AR at 215-16, 340-41, 1103, 1109. The Solicitation Price Model that offerors were required to submit and used for evaluation provided that the two base years were intended to start on April 1, 2005 and run in Fiscal Year ("FY") 2005 and 2006, with the three option years running from FY 2007 through FY 2009. *Id.* at 1099-1114. Section L of the Solicitation informed offerors the "implementation date for DTS CTO Travel Services contract is 1 Apr'05, therefore only six months (50%) of all tickets generated in this Travel Area in FY05 are under the DTS CTO contract (12893 [# of tickets]). The

'Traditional' fee applies even if the offeror receives DTS generated transactions because of the group travel issue. In FY06 and out, all tickets (25785) fall under this 'Traditional' pricing category. In FY10 the 60-month time period comes into play. Since the CTO Travel Services contract started 1 Apr'05 it will end 1 Apr'10, therefore only 50% of the ticket workload will come under this contract in FY10 for each ticket category. In this case 'Traditional' ticket workload will be 12893." *Id.* at 160. All offerors submitted prices that included Transaction fees from April 1, 2005 through March 31, 2010. No offeror submitted fees for contract periods beyond March 31, 2010.

The Solicitation incorporated by reference FAR 52.243-1 Changes – Fixed Price (Aug 1987) – Alternate I. AR at 128. The Solicitation incorporated by reference FAR 52.222-41, the Service Contract Act of 1965 Clause, which mandates that a contractor pay each service employee performing the contract wages and benefits as determined by any U.S. Department of Labor wage determination attached to the contract. *Id.* at 127; FAR 55.222-41(c)(1). The Solicitation included various wage determinations from the Labor Department for the 67 locations comprising the MEPS areas, AR at 482-82, dated between November 12, 2003 and January 8, 2004, *id.* at 482-1065. The wage determinations themselves were revised between May 30, 2003 and October 19, 2003. *See, e.g.*, *id.* at 484, 502, 511, 520, 529, 538, 564, 590, 814, 841, 850, 877, 940, 1012, 1030, 1057. Except for the required on-site CTO at the New Orleans MEPS, offerors were free to locate centralized call centers anywhere they chose to provide service to each MEPS within each Travel Area. The wage determinations in the Solicitation, however, did not cover the wages for any call center that an offeror might elect to locate outside the 67 locations comprising the MEPS areas. *See id.* at 189, 340-41, 482-1065. If an offeror chose to operate a centrally-operated call center outside the 67 MEPS locations, then

the contracting officer would determine which Labor Department wage determination applied.[7] *Id.* at 189. Thus, there would likely be different Labor Department wage determinations applicable to each offeror.

***B. Offers and Evaluations***

A significant number of offerors submitted proposals for each of six solicited MEPS regions. *See* AR at 1979 (15 proposals received for Travel Area 100), 1988 (16 proposals received for Travel Area 101), 1998 (17 proposals received for Travel Area 102), 2008 (9 proposals received for Travel Area 103), 2015 (13 proposals received for Travel Area 104), and 2024 (15 proposals received for Travel Area 105). Alexander Travel submitted offers for all six Travel Areas.[8] *Id.* at 1980, 1989, 1998, 2009, 2016, and 2025. El Sol submitted offers for Travel Areas 102, 103, 104, and 105. *Id.* at 1999, 2009, 2016, and 2025. Alexander and El Sol had significantly higher technical and lower performance risk scores than AirTrak Travel Systems, Inc. ("AirTrak"), WingGate Travel ("WingGate"), and The Alamo Travel Group ("Alamo") in the Source Selection Decisions for Travel Area 100, 101 and 105, and 102 and 104, respectively, but AirTrak, WingGate, and Alamo won those awards respectively based solely on price. *Id.* at 1981-86, 1990-95, 1999-2006, 2016-22, 2025-27, 2029-32. On or about January 3, 2005, all offerors were notified as to which offeror had been selected to receive awards for each of the six MEPS travel areas. A number of size protests were filed with the

---

7 Central call centers could not, however, be located in foreign countries. AR at 189.

8 Plaintiff Alexander Travel was awarded Contract W91QUZ-05-C-0005 (Travel Area 103) – a contract not in dispute in this litigation – on January 28,2005. AR at 1540. The start date of that contract was delayed because of a GAO protest, but only until October 1, 2005, approximately six months after the Government's planned start date of April 1, 2005. *See* AR at 1667-70; Def.'s Opp'n to Pls.' Mot. to Supplement AR and Compel Discovery ("Def.'s AR Opp'n") at 7.

Small Business Administration ("SBA") against Alamo, AirTrak and WingGate alleging, in part, that the three were affiliated. The SBA ultimately resolved the protests in favor of Alamo, AirTrak and WingGate, but the protests delayed the awards of the contracts.

### *C. AirTrak Contract*

On or about March 17, 2005, Contract W91QUZ-05-C-0005 (Travel Area 100), was awarded to AirTrak. AR at 1115, 3143-44. The base period of performance was October 1, 2005 through September 30, 2007, with the third of the three one-year options ending on September 30, 2010. *Id.* at 1224. Modification P00002, executed on August 11, 2005, designated AirTrak's contract start date as April 1, 2006, with the base period ending on March 31, 2008, while the end of the three one-year options was extended until March 31, 2011. *Id.* at 1247-48. Modification P00003, executed on March 22, 2006, delayed the contract start date until October 1, 2006. *Id.* at 1250. Modification P00004, executed on November 9, 2006, incorporated by reference FAR Clause 52.222-43 Fair Labor Standards Act and Service Contract Act – Price Adjustment into the contract. *Id.* at 1251-53. Modification P00006, executed on May 22, 2007, again changed AirTrak's contract start date to October 1, 2007, with the base period ending on September 30, 2009, while the end of the three one-year options was extended until September 30, 2012. *Id.* at 1256-57. Modification P00007, executed on September 10, 2007 raised the Global Distribution System ("GDS") transaction fees by $1.00. Def.'s Supplement ("Def.'s Suppl.") to AR at A37-39, A43. Otherwise, no contract modification has been issued to date changing the prices from those contained in the offer submitted on or about November 19, 2004. Def.'s Opp'n to Pls.' Mot. to Supplement AR and Compel Discovery ("Def.'s AR Opp'n") at 10; AR at 1115.

***D. WingGate 101 Contract***

On February 1, 2005, Contract W91QUZ-05-C-0006 (Travel Area 101) was awarded to WingGate. AR at 1259, 3144. The base period of performance was October 1, 2005 through "September 31(sic)," 2007, with the third of the three one-year options ending on "September 31 (sic)," 2010. *Id.* at 1367. Modification P00002, executed on September 21, 2005, changed WingGate's contract start date to April 1, 2006, with the base period ending on March 31, 2008, while the end of the three one-year options was extended until March 31, 2011. *Id.* at 1390-91. Modification P00003, executed on March 22, 2006, delayed the contract start date until October 1, 2006. *Id.* at 1393. Modification P00004, executed on November 29, 2006, incorporated by reference FAR clause 52.222-43 Fair Labor Standards Act and Service Contract Act – Price Adjustment into the contract. *Id.* at 1395-97. Modification P00005, executed on April 27, 2007, changed WingGate's contract start date to October 1, 2007, with the base period ending on September 30, 2009, while the end of the three one-year options was extended until September 30, 2012. *Id.* at 1398-99. The Government plans to issue a contract modification to this contract to raise the GDS transaction fees by $1.00 before the end of September, 2007. Def.'s AR Opp'n at 9 n.5 (citing AR at 122); Def.'s Suppl. to AR at A44. Otherwise, no contract modification has been issued to date changing the prices from those contained in the offer submitted on or about November 19, 2004. Def.'s AR Opp'n at 10; AR at 1259.

***E. Alamo 102 Contract***

On or about March 3, 2005, Contract W91QUZ-05-C-0007 (Travel Area 102) was awarded to Alamo. AR at 1401, 3144. The base period of performance was October 1, 2005 through September 30, 2007, with the third of the three one-year options ending on September 30, 2010. *Id.* at 1509. Modification P00002, executed on August 17, 2005, changed Alamo's contract start date to April 1, 2006, with the base period ending on March 31, 2008, while the

end of the three one-year options was extended until March 31, 2011. *Id.* at 1530-31. Modification P00003, executed on March 22, 2006, delayed the contract start date until October 1, 2006. *Id.* at 1533. Modification P00004, executed on November 27, 2006, incorporated by reference FAR clause 52.222-43 Fair Labor Standards Act and Service Contract Act – Price Adjustment into the contract. *Id.* at 1535-37. Modification P00005, executed on May 2, 2007, changed Alamo's contract start date to October 1, 2007, with the base period ending on September 30, 2009, while the end of the three one-year options was extended until September 30, 2012. *Id.* at 1538-39. The Government plans to issue a contract modification to this contract to raise the GDS transaction fees by $1.00 before the end of September, 2007. Def.'s AR Opp'n at 9 n.5 (citing AR at 122); Def.'s Suppl. to AR at A44. Otherwise, no contract modification has been issued to date changing the prices from those contained in the offer submitted on or about November 19, 2004. Def.'s AR Opp'n at 10; AR at 1401.

***F. Alamo 104 Contract***

On or about March 3, 2005, Contract W91QUZ-05-C-0009 (Travel Area 104) was awarded to Alamo. AR at 1699, 3144. The base period of performance was October 1, 2005 through September 30, 2007, with the third of the three one-year options ending on September 30, 2010. *Id.* at 1807. Modification P00002, executed on August 29, 2005, changed Alamo's contract start date to April 1, 2006, with the base period ending on March 31, 2008, while the end of the three one-year options was extended until March 31, 2011. *Id.* at 1828-29. Modification P00003, executed on March 22, 2006, delayed the contract start date until October 1, 2006. *Id.* at 1831. Modification P00004, executed on November 27, 2006, incorporated by reference FAR clause 52.222-43 Fair Labor Standards Act and Service Contract Act – Price Adjustment into the contract. *Id.* at 1833-35. Modification P00005, executed on May 4, 2007, changed Alamo's contract start date to October 1, 2007, with the base period ending on

September 30, 2009, while the end of the three one-year options was extended until September 30, 2012. *Id.* at 1836-37. The Government plans to issue a contract modification to this contract to raise the GDS transaction fees by $1.00 before the end of September, 2007. Def.'s AR Opp'n at 9 n.5 (citing AR at 122); Def.'s Suppl. to AR at A44. Otherwise, no contract modification has been issued to date changing the prices from those contained in the offer submitted on or about November 19, 2004. Def.'s AR Opp'n at 10; AR at 1699. No contract modification has been issued to date reflecting the fact that the New Orleans MEPS has been closed and the required on-site staffed CTO included in the proposal is no longer required.

***G. WingGate 105 Contract***

On February 1, 2005, Contract W91QUZ-05-C-0010 (Travel Area 105) was awarded to WingGate. AR at 1838, 3144. The base period of performance was October 1, 2005 through "September 31 (sic)," 2007, with the third of the three one-year options ending on "September 31 (sic)," 2010. *Id.* at 1946. Modification P00002, executed on August 29, 2005, changed WingGate's contract start date to April 1, 2006, with the base period ending on March 31, 2008, while the end of the three one-year options was extended until March 31, 2011. *Id.* at 1967-68. Modification P00003, executed on March 22, 2006, delayed the contract start date until October 1, 2006. *Id.* at 1970. Modification P00004, executed on November 29, 2005, incorporated by reference FAR clause 52.222-43 Fair Labor Standards Act and Service Contract Act – Price Adjustment into the contract. *Id.* at 1972-74. Modification P00005, executed on May 3, 2007, changed WingGate's contract start date to October 1, 2007, with the base period ending on September 30, 2009, while the end of the three one-year options was extended until September 30, 2012. *Id.* at 1975-76. Modification P00006, executed on May 10, 2007, reiterated the new contract dates. *Id.* at 1977-78. The Government plans to issue a contract modification to this contract to raise the GDS transaction fees by $1.00 before the end of September, 2007. Def.'s

AR Opp'n at 9 n.5 (citing AR at 122); Def.'s Suppl. to AR at A44. Otherwise, no contract modification has been issued to date changing the prices from those contained in the offer submitted on or about November 19, 2004. Def.'s AR Opp'n at 10; AR at 1838.

### *H. Previous Protest & Settlement Agreement*

On April 26, 2004, CW Government Travel, Inc. ("Carlson"), a large company not affiliated with Plaintiffs, filed a complaint for declaratory judgment in this Court arguing, in part, that the Solicitation would violate Carlson's exclusive contractual right to provide the Army with traditional travel services at 54 MEPS sites. AR at 2034-35. The parties reached a settlement agreement that provided, in part, that (a) the Government could terminate at no cost Carlson's contracts at any time before October 1, 2007, after 60 days' notice, and (b) no other contractor could perform the travel service requirements of the 54 MEPS sites in Carlson's contracts as long as Carlson's performance was satisfactory. *Id.* at 2037-38. The settlement agreement, however, did not prevent the Government from re-competing the MEPS site work prior to October 1, 2007. *See id.* at 2034-39. Based on the settlement agreement, the parties stipulated for dismissal on June 10, 2005. *Id.* at 2039.

### *I. Prices*

The Government has included in the Administrative Record a contract transaction fees matrix for the six MEPS and 13 non-MEPS contracts. Index to AR at 6; AR at 3135-36; Def.'s AR Opp'n at 10. Under the non-MEPS contracts which were awarded and commenced performance in 2005, AirTrak, Alamo, and WingGate have received significant increases in the transaction fees. *See* AR at 3135-36. The Administrative Record contains no information regarding price adjustments that AirTrak, Alamo and WingGate may be entitled under the various equitable adjustment clauses in the MEPS contracts, including the adjustment clause

added after contract award to reflect increases in DOL wage determinations from those 2003 rates in effect when offers were submitted in 2004.

## ARGUMENT

### *A. Jurisdiction and Standard of Review*

#### 1. Court Of Federal Claims Has Jurisdiction Over Post-Award Bid Protests

This Court has jurisdiction over this case under the Tucker Act since the claim involves objections to the award of a government contract and violations of statutes or regulations in connection with a Government procurement. *Cardinal Maint. Serv., Inc. v. United States*, 63 Fed. Cl. 98, 105 (2004) (quoting 28 U.S.C. § 1491(b)(1)). Under 28 U.S.C. § 1491(b)(1), the Court of Federal Claims reviews challenges to agency actions according to the standards set forth in the Administrative Procedure Act, 5 U.S.C. §§ 701-06 ("APA"). *Id.* "Under the APA, the reviewing court may only overturn an agency action if the court finds that it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Id.* (quoting 5 U.S.C. § 706(2)(A) (2004)).

Deference to a contracting officer's decision under the APA "is contingent upon an offering by the agency of a reasoned explanation for its decision which is in accord with material facts contained in the administrative record." *Nutech Laundry & Textile, Inc. v. United States*, 56 Fed. Cl. 588, 593 (2003) (citations omitted). "'Not only must an agency's decreed result be within the scope of its lawful authority, but the process by which it reaches that result must be logical and rational.'" *Id.* (quoting *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374 (1998)). "Ultimately, the basis for the [contracting officer's] decision must be transparent." *Id.* at 595.

### 2. Judgment On The Administrative Record Is Appropriate Under RCFC 52.1

Rule 52.1 of the Rules of the United States Court of Federal Claims ("RCFC") provides for judgment on the administrative record. RCFC 52.1(b); *DynCorp Intern. LLC v. United States*, 76 Fed. Cl. 528, 536 (2007). "To review a motion, or cross-motions, under RCFC 52.1, the court asks whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record." *DynCorp Intern. LLC*, 76 Fed. Cl. at 536 (citing *Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005)). The court must make fact findings where necessary, and the resolution of RCFC 52.1 cross-motions – as we anticipate will be filed here – is akin to an expedited trial on the paper record. *Id.*

As stated above and in separate motions, Plaintiffs contend that the Government has not produced a complete or adequate Administrative Record to date, although the sparse facts available establish that delaying the start of a contract two and one-half years and extending the total contract period two and one-half years beyond the solicited competitive pricing is a cardinal change.

## *B. This Procurement Violates the Law, and That Violation Has Harmed Plaintiffs*

"The Competition in Contracting Act (CICA) requires executive agencies, when procuring property or services, to '. . . obtain full and open competition through the use of competitive procedures.'" *AT&T Communications, Inc. v. Wiltel, Inc.*, 1 F.3d 1201, 1204-05 (Fed. Cir. 1993) (quoting 41 U.S.C. § 253(a)(1)(A) (1988)). While CICA does not prevent modification of a contract, modifications outside the scope of the original competed contract require competition. *See id.* at 1205. The inquiry, in fact, focuses on whether the Government modifications changed the contract so profoundly as to circumvent the statutory requirement of competition. *CW Gov't Travel, Inc. v. United States*, 61 Fed. Cl. 559, 574 (2004) (citation

omitted). After all, if the Government could make out-of-scope changes simply by changing the scope of a contract after award, then the purposes of the CICA would be largely defeated. *Cardinal Maint. Serv., Inc.*, 63 Fed. Cl. 98, 108 (2004) (citing *Krygoski Constr. Co., Inc. v. United States*, 94 F.3d 1537, 1543 (Fed. Cir. 1996)).

In this case, the Government has violated the law in numerous ways, as discussed below.

**1. Government Has Failed To Consider Its Actual Contract Requirements**

It is axiomatic that to establish a binding express Government contract, one must show mutuality of intent to contract, offer and acceptance, consideration, and that the government official whose conduct is relied on had actual authority to bind the government in contract. *Zoubi v. United States*, 25 Cl. Ct. 581, 585 (1992) (citing *Clean Giant, Inc. v. United States*, 19 Cl. Ct. 390, 393 (1990)). Any manifestation of mutual intent to contract, however, is meaningless "unless the terms of the contract are reasonably certain." *See* RESTATEMENT (SECOND) OF CONTRACTS § 33 (1992)[9]. The terms in any contract that must be reasonably certain include price and period of performance.

Firm, fixed-price contracts, such as the ones in dispute here, are suitable for acquiring services on the basis of reasonably definite functional or detailed specifications when the contracting officer can establish fair and reasonable prices at the outset, such as when, among other factors, "[a]vailable cost or pricing information permits realistic estimates of the probable costs of performance." FAR 16.202-2(c).

---

9 "The Restatement of Contracts reflects many of the contract principles of federal common law." *Long Island Savings Bank, FSB v. United States*, --- F.3d ---, No. 2006-5029, slip op. at 18 (Fed. Cir. Sept. 13, 2007).

In the 2004 procurement, the Government provided exhaustive information for each of the 54 MEPS sites at issue based upon the most recent historical data then available (FY 2003). *See* AR 340-481. That information was updated and expanded as much as possible during the procurement in response to requests from offerors. AR 168-219. The Government not only provided the number of annual tickets issued for each MEPS site, but also a breakdown of the methods used to pay for such tickets by MEPS site. AR 340-481. The Government also provided for the travelers from each MEPS site identification of the ten most frequently used airports, both for departure and destination. AR 350-481. The Government provided this workload information because it was absolutely critical for offerors to determine the personnel and physical resources necessary to perform the contract and provide reasonable and realistic firm-fixed prices for the projected contract period of April 1, 2005 through March 31, 2010.

Implicit in the concept of price realism is the notion that prices are contemporaneous to the procurement. After all, it would likely be difficult to find a motorist in the United States today who, if given the choice, would not prefer to pay the 1972 price for gasoline. Nevertheless, if the Government, as it appears to argue here, has an unlimited right to delay the start of performance of a contract after a competitive procurement, then there is a substantial risk that contract performance prices bid in November 2004 will be entirely dissociated from reality, making price realism impossible to achieve and undermining the goals of competitive procurements. In fact, no competitive prices were even sought for the last two and one-half years of the modified contracts. It is obvious that the Government will engage in sole-source negotiations of price increases due to the changes in requirements and rising costs since November 2004.

It simply cannot be the case that the Government can delay the performance of a contract by a process of creeping modifications for two and one-half years and extend it 50 percent beyond the period for which competitive pricing was obtained. If the Government is permitted to change contracts in this manner, then the entire doctrine of competitive procurement is undermined. Even so, that appears to be exactly what the Government is doing here.

The Plaintiffs, and a number of other 2004 offerors, never had an opportunity to compete for contracts that would commence on October 1, 2007 and extend through September 30, 2012. The Government has never had the benefit of a competitive procurement for MEPS travel management services commencing on October 1, 2007 that reflects its current workload requirements, current Department of Labor wage determinations, significant changes in the Government's own automated Defense Travel System, and vast changes in technical capabilities since 2004 within the commercial travel industry to transmit and store information.

*a. Government's Failure to Re-Compete Contracts Represents Cardinal Change When Contract Start Dates Are So Delayed That Half the Original Contract Period Has Already Passed*

In determining whether a contract modification constitutes a cardinal changes to the contract that would fall within CICA's competitions requirement, the Federal Circuit examines whether the contract as modified materially departs from the scope of the original procurement. *Wiltel, Inc.*, 1 F.3d at 1205 (citations omitted). In determining the materiality of a modification, the GAO and the courts consider factors such as the extent of any changes in the type of work, performance period, and costs between the contract as awarded and as modified. *Neil R. Gross & Co.*, B-237434, 90-1 CPD ¶ 212 (Feb. 23, 1990) (citations omitted), *aff'd on reconsideration*, B-237434.2, 90-1 CPD ¶ 491 (May 22, 1990); *Cardinal Maint. Serv., Inc.*, 63 Fed. Cl. at 106; *see also Wiltel, Inc.*, 1 F.3d at 1205 ("The analysis thus focuses on the scope of the entire original procurement in comparison to the scope of the contract as modified."). The GAO also

considers whether the solicitation for the original contract adequately advised offerors of the potential for the type of changes during the course of the contract that in fact occurred, or whether the modification is of a nature which potential offerors would reasonably have anticipated under the changes clause. *Neil R. Gross & Co.*, B-237434; *Cardinal Maint. Serv., Inc.*, 63 Fed. Cl. at 106.

Determining whether a modification of contract terms constitutes a cardinal change is a question of contract interpretation for the court to decide, based on the intent of the parties. *CW Gov't Travel, Inc.*, 61 Fed. Cl. at 571 (citations omitted). "The contemporaneous interpretation of the parties, during contract performance and before interpretation of the contract became a subject of controversy, is of great, if not controlling, weight." *Id.* (citing *Max Drill, Inc. v. United States*, 427 F.2d 1233, 1240 (Ct. Cl. 1970). Given the Government's steadfast refusal to provide a complete administrative record, the Court has no tools to determine the contemporaneous interpretation of the parties regarding the scope of the contract, aside from the plain language of the contractual texts. The plain language of the contracts, however, plainly fails to state that the Government could extend the contract performance periods indefinitely. Rather, the Solicitations specifically linked the performance periods to certain fiscal years. Therefore, one must conclude that extending the contract performance periods by two and one-half years was most emphatically not within the contemplation of the parties.

While it is normally true that providing additional time to a government contractor to perform a contractual obligation does not constitute a cardinal change, that principle does not apply when time is the critical element in defining the obligation of the Government contract. *Defense Sys. Group*, B-240295, 1990 WL 293,536, at *4 (Nov. 6, 1990) (citation omitted); *see also Ingersoll-Rand*, B-225996, 87-1 CPD ¶ 474 (May 5, 1987) ("There is a significant

difference between those situations where a contractor is given additional time to perform a contractual obligation and those where time is used to define the extent of an obligation.") (citation omitted).

In *Defense Systems*, due to errors in technical specifications, contract price increased by approximately $3 million (20%) and delivery was delayed 18 months, but the GAO held that there was no cardinal change since the increased difficulty of performance had caused the delay and cost increase, and increased difficulty in performance did not constitute a cardinal change. *Defense Sys. Group*, B-240295. On the other hand, an Air Force decision to exercise a third option year, based on out-of-date pricing data and in the face of a 30-50% cost increase during the previous years, was held to be improper. *AAA Eng'g & Drafting, Inc.*, B-236034.2, 92-1 CPD ¶ 307 (Mar. 26, 1992). In *AAA*, although the protest involved whether the agency's decision to exercise a contract option was in the Government's best interest, the analysis focused on the out-of-date prices the agency used to justify its option decision. *Id.* Such analysis is equally appropriate here.

By negotiating five-year contracts in 2007, based on offers made in 2004 using FY 2003 labor and workload data, when the contracts were meant to start in 2005, the Government circumvents the requirement to secure competitive technical and cost proposals for the personnel and resources necessary to perform the current known requirements for the next five years.

**(1) The changes in workload requirements and cost factors since the 2004 procurement do not affect all offerors equally**

As explained above, the various elements that comprised the original bids in 2004 have not changed for all the offerors in the same way during the intervening two and one-half years. For example, since the Solicitation permitted offerors to establish off-site call centers to handle most of the work, the location of each of those centers would have a substantial impact on the

individual transaction prices that each offeror could offer. These sites would not necessarily have been in the wage determination areas included in the Solicitation. Considering the economic upheaval in various parts of the country during the past two and one-half years, potential offerors with call centers in affected areas might conceivably be able to offer prices even lower than those offered by the awardees.

Another example is the fact that, in 2004, offerors for Travel Area 104 were required to provide and include the cost of a staffed, on-site CTO at the New Orleans MEPS. Since offerors had to provide such a staffed CTO, it is only logical that they would use it to service other MEPS sites in the Travel Area. However, Hurricane Katrina eliminated this requirement in New Orleans causing a substantial change in the requirements and costs for this particular Travel Area.

Moreover, as demonstrated in the Administrative Record, the performance of the contract was pegged to specific fiscal years. Linking performance years to specific fiscal years would be a prudent means of achieving the price realism required in a firm-fixed-price contract. Neither the Solicitation nor the awarded contracts contained any provision permitting the Government to delay the start of performance by two and one-half years, such that the first half of the first base year is actually the second half of the first option year. Moreover, no prices were solicited in 2004 to cover the period from March 31, 2010 through September 30, 2012. Since these modifications were, therefore, not within the contemplation of the parties at the time of contract formation, they are cardinal changes and are, thus, improper.

**(2) The Government appears to have waived contract requirements for the benefit of tbe awardees**

Information pertaining to the performance of the non-MEPS contracts awarded in 2005 to these same awardees indicates that they are sharing central call centers. The Solicitation

required that each contractor perform at least 50 percent of the personnel cost of contract performance with its own employees. AR at 205. The Solicitation also required that each contractor must perform at least 51% of the work with its own resources and organization. AR 170, 178.

It has become public knowledge that the three awardees are using the same, shared central reservation call centers in performing the non-MEPS contracts. If one contractor is able to use employees or facilities of another contractor to perform, particularly in surge situations or to provide the 24 hour emergency service, it greatly reduces costs. If the Government is allowing these three awardees to share common call centers to perform the MEPS travel services rather than depend on their own employees and resources this would constitute another cardinal change in the requirements of the 2004 procurement. It would also create an affiliation between the awardees in violation of the Small Business requirements for the 2004 Solicitation. *See* FAR 52.219-14.

The Government's refusal to provide the basic documents reflecting communications with the three awardees may be designed to conceal the fact that these awardees intend to share common call centers to perform the MEPS contracts.

*b. Alternatively, Fundamental Change in Contract Requirements in Form of Lengthy Delay in Start of Performance Has Resulted in Unlawful Sole Source Procurement*

The Government's lack of diligence in seeking full and open competition for five years of MEPS travel services commencing on October 1, 2007, does not permit the Government to engage in sole-source procurements. The law and regulations permit contracting without providing for full and open competition only in specified, limited circumstances, as follows: (a) only one responsible source exists and no other supplies or services will satisfy agency requirements; (b) unusual and compelling urgency; (c) industrial mobilization; engineering,

developmental, or research capability; or expert services; (d) international agreement; (e) authorized or required by statute; (f) national security; and (g) public interest. *See* 10 U.S.C. § 2304(c); *see also* FAR 6.302. These exceptions do not include the agency's failure to plan adequately or lack of attention to the passage of time. In fact, CICA specifically provides that agencies may not justify the use of noncompetitive procedures on the basis of a lack of advanced planning. *TeQcom, Inc.*, B- 224664, 86-2 CPD ¶ 700 (Dec. 22, 1986) (citations omitted). "The mandate for agencies to effect some modicum of competition is reiterated in 10 U.S.C. § 2304(e), which provides that when an agency utilizes other than competitive procedures based on unusual and compelling urgency, the agency 'shall request offers from as many potential sources as is practicable under the circumstance.'" *WorldWide Language Resources, Inc.*, B-296984, 2005 CPD ¶ 206 (Nov. 14, 2005) (citing FAR 6.302-2(c)(2)). Further, "in addition to the CICA requirement for advance planning and market research, even when other than competitive procedures are appropriate, an agency has a responsibility under 10 U.S.C § 2304(e) to request offers from as many potential sources as is practicable under the circumstances." *K-Whit Tools, Inc.*, B-247081, 92-1 CPD ¶ 382 (Apr. 22, 1992).

The Government has known since June 2005, when it executed the Settlement Agreement from the prior bid protest, that the work described in the disputed contracts could not commence until October 1, 2007. Despite this ample advance notice, the Government has apparently done nothing in the interim other than issue delay and extension modifications, knowing full well that the later the start date fell back, the more out-of-date would be the underlying price data of the original offers. The facts of this case are directly on-point with the prohibition on letting the Government profit from its own bureaucratic indolence in the procurement process. The Court

may, therefore, find that the negotiation of these contract start delays and extension of the option periods are effectively illegal sole-source procurements.

### 2. Government Has Failed To Adequately Consider Contract Price Increases

The Solicitation asked for price offers for the period from April 1, 2005 through March 30, 2010. The Solicitation requested no offers for the period from April 1, 2010 through September 30, 2012, but this latter period is the new second half of the contract performance period. The only reason that awardees won the contracts was their lower price in the November 2004 proposals, but neither they nor any other offerors submitted price quotes for any period after April 1, 2010. The contracts contain a number of equitable adjustment provisions that are triggered by changes in a number of factors since November 2004. However, as explained above such equitable adjustment provisions will not effect all offerors equally.

Essentially, all of the MEPS and non-MEPS contracts, however, posit increases in prices over their five-year performance periods. AR at 3135-36. Although Defendant has called an examination of the full range of these prices, including as they do MEPS and non-MEPS contracts, an "apples-to-oranges comparison," Def.'s AR Opp'n at 12, they demonstrate the validity of the much more economically fundamental and non-controversial thesis that prices typically rise over time. How much those increases will be would vary from company to company based on their other contracts, potential economies of scale, and increased efficiency possible from know-how acquired on similar contracts, new technology, increases or decreases or shifting of workload from particular MEPS sites . Given all those variable factors, it is extremely unlikely that the prices offered in 2004 would be anything like the prices offered for the same services in 2007 for contracts extending through September 30, 2012.

This notion would also be true given that the Solicitation contemplated a transition from traditional travel services to DTS. Although the Army did not achieve its FY 2006 DTS launch goals, the simple fact is that Web-based travel service systems are far more robust and powerful now than they were three years ago, leading to the reasonable inference that the Army would be able to meet its DTS goals sooner rather than later. In 2004, the Government did not have sufficient information regarding DTS utilization for MEPS travel to permit offerors to develop reasonable fixed prices. If the status of DTS in 2007 permits competitive pricing through 2012, the Government should conduct such competition rather than engage in sole source DTS price negotiations with these 2005 awardees. A current competition that includes DTS transaction fees could substantially change the pricing of offerors for the next five years.

The Government contends that since it has not yet issued contract modifications affecting price changes, the Court should not compel production of documents reflecting identification of future price changes by the Government and awardees. It is noted that subsequent to contract awards, the Government added FAR Clause 52.222-43 permitting price adjustments due to increases in the 2003 DOL wage determinations. It defies common sense not to consider the inevitable consequence of that contractual modification, coupled with the delayed and extended contract period.

**3. Government Has Failed To Provide Critical Information To All Offerors**

Plaintiffs and awardees submitted offers in November 2004, for a Solicitation that did not reflect reality. Commencing performance of the five-year MEPS travel service contracts in October 2007, under different economic and operational conditions, is fundamentally different than doing so in April 2005. Offerors calculated prices based on contract start dates of April 1, 2005, for a potential contract life of five years, all of which were pegged to certain fiscal years. *See* AR at 1099. What resulted from this procurement, however, was something different:

contracts thirty months off schedule. It is impossible to say whether the offerors not winning contract awards would have submitted lower or higher prices than they did, if they had known of the true start dates because they did not make offers for the true dates or the entire contract period.

The goal of the Federal procurement regime is "to deliver on a timely basis the best value product or service to the customer, while maintaining the public's trust and fulfilling public policy objectives." FAR 1.102(a). Likewise, the Government seeks to promote competition. FAR 1.102. Despite these two goals, enshrined in the regulations, the Government somehow believes that it is providing the best value product, while maintaining public trust, and fostering competition by failing to re-compete contracts that will not even start until half-way through their originally conceived performance periods. How this could be possible as a matter of policy is a mystery. An even greater mystery is why the Government, after such a long delay, would want to proceed with these stale procurements. Surely, the Government would obtain the best, most accurate price quotes from the strongest offerors if it had contemporary data upon which to base its procurement decisions.

The Government's failure to re-compete the disputed contracts has worked a cardinal change in those contracts, resulted in an illegal sole-source procurement, failed to take into account that prices change over time, and led to an uneven playing field. By awarding contracts so far beyond the planned start date, the Government has behaved in an arbitrary and capricious manner and prejudiced Plaintiffs. *Geo-Seis Helicopters, Inc. v. United States*, 77 Fed. Cl. 633, 639 (2007) (citing *Bannum, Inc.*, 404 F.3d at 1351; *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1057 (Fed. Cir. 2000)).

### *C. The Court Should Grant Plaintiffs' Motion for Injunctive Relief and Either Terminate the Awards for Convenience or Re-open the Procurement*

"The Court of Federal Claims has jurisdiction to award injunctive relief pursuant to 28 U.S.C. 1491(b)(2) (2004)." *Cardinal Maint. Serv., Inc.*, 63 Fed. Cl. 98 at 110. "[P]ermanent injunctive relief has been granted where the 'plaintiff establishes by a preponderance of the evidence that: (1) it has achieved actual success on the merits; (2) it will suffer irreparable injury if injunctive relief is not granted; (3) the harm to plaintiff if an injunction is not granted outweighs the harm to the Government and third parties if an injunction is granted; and (4) granting the injunction serves the public interest.'" *Id.* (citations omitted). Since Plaintiffs have shown in sufficient detail above how they should prevail on the merits, the first element required for a permanent injunction, this analysis will focus on the remaining three prongs for equitable relief.

#### 1. Plaintiffs Will Suffer Irreparable Harm If Awardees Are Allowed To Commence Performance Of The Awarded Contract

A "lost opportunity to compete has been found sufficient to constitute irreparable harm." *Int'l Res. Recovery, Inc. v. United States*, 60 Fed. Cl. 1, 8 (2004) (citing *United Payors & United States Providers Health Servs., Inc. v. United States*, 55 Fed. Cl. 323, 333 (2005)); *see also United Int'l Investigative Servs., Inc. v. United States*, 41 Fed. Cl. 312, 323 (1998) ("the opportunity to compete for a contract and secure any resulting profits has been recognized to constitute significant harm.") (citing *Magnavox Electronic Sys. Co. v. United States*, 26 Cl. Ct. 1373, 1379 (1992)); *see also PGBA, LLC v. United States*, 57 Fed. Cl. 655, 664 (2003).

First, it is well-settled that Plaintiffs cannot recover lost profits from their bid protest action. *See Lion Raisins, Inc. v. United States*, 52 Fed. Cl. 115, 119 (2002) (lost profits not available on implied-in-fact contract theory; remedy for recovery in bid protest actions is typically injunctive relief). Thus, Plaintiffs do not have an adequate remedy at law if they are

successful in this bid protest. "This loss of profit, for which there is no adequate remedy at law, is accepted as a 'specific, irreparable injury' that warrants the entry of an injunction." *MVM, Inc. v. United States*, 46 Fed. Cl. 137, 142 (1999) (citing *Wetsel-Oviatt Lumber Co. v. Untied States*, 43 Fed. Cl. 748, 753 (1999)). As this Court has stated:

> Denial of the opportunity to obtain the present contract and the profits derived therefrom is precisely what plaintiff refers to when alleging its 'lost opportunity to compete'. This is an irreparable injury.

*Magnavox Elect. Sys. Co.*, 26 Cl. Ct. at 1379.

Many opinions in the Court of Federal Claims have recognized that lost profits and lost opportunities to compete may constitute irreparable harm. *See J & H Reinforcing and Structural Erectors v. United States*, 50 Fed. Cl. 570, 577 (2001); *Overstreet Elec. Co. v. United States*, 47 Fed. Cl. 728, 744 (2000); *Seattle Sec. Servs., Inc. v. United States*, 45 Fed. Cl. 560, 571 (2000);; *TRW Envtl. Safety Sys., Inc. v. United States*, 18 Cl. Ct. 33, 78 (1989). This is precisely the harm that Plaintiffs will suffer if injunctive relief is not granted.

In this case, Plaintiffs were not able to bid on the actual contracts because the terms of the contracts that resulted are fundamentally different from the requirements specified in the 2004 Solicitation. The changes made to performance dates were not within the scope of the original contracts. As such, Plaintiffs were prejudiced by not being able to compete on a level playing field.

**2. The Harm To Plaintiffs Outweighs Any Potential Harm To The Awardees**

The third element of a permanent injunction consideration requires that the Court "balance the potential harm to the plaintiff of not granting the injunction against the potential harm to both the Government and the awardee should the injunction be granted." *Gentex Corp. v. United States*, 58 Fed. Cl. 634, 654 (2003).

The harm that Plaintiffs will suffer if this Motion is not granted outweighs the harm to both the Government and the awardees if the injunction is granted. If the Motion is denied, Plaintiffs will suffer significant, irreparable harm including losing the opportunity to bid on contracts by means of full and open competition.

On the other hand, neither the Government nor the awardees will suffer any harm because they are benefiting from CICA violations and, "as such, suffer[s] no harm when the violation is corrected." *Cardinal Maint. Serv., Inc.*, 63 Fed. Cl. at 111 (citing *Al Ghanim Combined Group Co. v. United States*, 56 Fed. Cl. 502, 520 (2003)). In addition, the Government would benefit from re-competing the contracts. When contracts are competitively bid, rather than cardinally changed, the Government might receive better offers than those it has with the incumbent contract-holders, thanks to the full and open competition. *See id.*

Further, an injunction should be granted when doing so "will remove the taint of illegality from this procurement process without interfering with the Government's discretion to select its own contractors." *Parcel 49C L.P. v. United States*, 31 F.3d 1147, 1154 (Fed. Cir. 1994). Such is the case here. It has been demonstrated that the contracts in question have been changed beyond the scope of their original terms in a way that is arbitrary and capricious, to say nothing of being poor procurement policy.

Granting an injunction in favor of Plaintiffs will help ensure that the taint of this procurement is removed from these contracts.

**3. Granting Injunctive Relief Is Strongly In The Public Interest**

The public interest is served by granting injunctive relief because the public has a strong interest in protecting the competitive process. *See Dairy Maid Dairy v. United States*, 837 F. Supp. 1370, 1382 (E.D. Va. 1993) ("The public interest is promoted by protecting the integrity of the Government procurement process."); *MVM, Inc.*, 46 Fed. Cl. at 143 ("Many cases have

recognized that the public interest is served when there is integrity in the public procurement system."); *Minor Metals, Inc. v. United States*, 38 Fed. Cl. 16, 21 (1997). The public interest "'is served by enforcing a procurement process that conforms with . . . the solicitation's evaluation criteria.'" *Cardinal Maint. Serv., Inc.*, 63 Fed. Cl. at 111 (quoting *Al Ghanim*, 56 Fed. Cl. at 521). Requiring the Government to seek competition for the services it actually requires through a proper solicitation preserves the integrity of the Federal procurement process and, therefore, serves the public interest, as does an injunction mandating a re-solicitation that would minimize the costs that taxpayers must pay for those services. *See id.* (citations omitted). By granting an injunction, the Court will enforce a process whereby bidders can be confident that the contracts on which they bid will be the contracts which are awarded and performed. *Id.*

## CONCLUSION

Simply stated, when it became clear to the Government after contract execution in 2005 that the awardees of these disputed contracts would not be able to perform until 2007, they should have re-competed the work. It would have been the prudent thing to do. It would have recognized that the Government would have gotten more realistic prices for the later period, and would have increased the chances of getting better prices from offerors rated as technically superior and lower performance risks than the awardees. Re-competing would also have conformed to the CICA and the FAR. The Government, however, chose a different course. The Government instead chose, without contractual support for that choice, to modify continuously the already-awarded contracts to delay their start dates and extend the total contract period. Whether the continual delays were the result of an internal bureaucratic debate over the wisdom of re-competing the contracts and reflect some rational basis for the choices made, we do not know, because the Government has refused to produce that information. What we do know is

that the five-year contracts that will commence performance on October 1, 2007, are not the same contracts competed in 2004, nor are they the same as those awarded in 2005, and the changes in performance parameters are fundamental, out-of-scope, and arbitrary and capricious. The Government's violations of the CICA and the FAR have prejudiced Plaintiffs, and Plaintiffs respectfully request that the Court grant its Motion for Judgment on the Administrative Record.

Dated: September 14, 2007

Respectfully submitted,

/s/ Lars E. Anderson
Lars E. Anderson
VENABLE LLP
8010 Towers Crescent Drive, Suite 300
Vienna, Virginia 22182
(703) 760-1600 (Telephone)
(703) 821-8949 (Facsimile)
(703) 760-1623 (Protected Facsimile)
*Attorney of Record*

*Of Counsel:*
Peter A. Riesen
Keir X. Bancroft
Patrick R. Quigley
VENABLE LLP
8010 Towers Crescent Drive, Suite 300
Vienna, Virginia 22182
(703) 760-1600 (Telephone)
(703) 821-8949 (Facsimile)
(703) 760-1623 (Protected Facsimile)

# CERTIFICATE OF SERVICE

Plaintiffs have filed this document electronically via the ECF electronic filing Website of the United States Court of Federal Claims and in accordance with para. 19 of General Order 42A of the Court of Federal Claims have, therefore, served notice on counsel of record for Defendant.

Dated: September 14, 2007

Respectfully submitted,

/s/ Lars E. Anderson

Lars E. Anderson
VENABLE LLP
8010 Towers Crescent Drive, Suite 300
Vienna, Virginia 22182
(703) 760-1600 (Telephone)
(703) 821-8949 (Facsimile)
(703) 760-1623 (Protected Facsimile)
*Attorney of Record*

MC1DOCS1/234069.01