# In the United States Court of Federal Claims

**No. 07-612C**
**(Filed: October 2, 2007)****

****OPINION ORIGINALLY FILED UNDER SEAL ON SEPTEMBER 25, 2007**

| | | |
|---|---|---|
| * * * * * * * * * * * * * * * * * * * | * | |
| | * | |
| **CWT/ALEXANDER TRAVEL, LTD,** | * | |
| | * | |
| | * | |
| | * | |
| **and** | * | |
| | * | **Post-Award Bid Protest; Start Date** |
| | * | **Delay; Cardinal Change; Violation of** |
| **CWT/EL SOL TRAVEL, INC.,** | * | **the Competition in Contracting Act** |
| | * | **("CICA").** |
| **Plaintiffs,** | * | |
| | * | |
| **v.** | * | |
| | * | |
| **THE UNITED STATES,** | * | |
| | * | |
| **Defendant.** | * | |
| | * | |
| * * * * * * * * * * * * * * * * * * * | * | |

*Lars E. Anderson,* Vienna, VA, for plaintiff. *Peter A. Riesen*, *Keir X. Bancroft*, and *Patrick R. Quigley*, Vienna, VA, of counsel.

*Melinda D. Hart,* U.S. Department of Justice, Washington, DC, with whom were *Peter D. Keisler, Assistant Attorney General* and *Director Jeanne E. Davidson,* for defendant. *Major Patrick Gary*, *Gregory Moritz* and *Robert Dudley*, Department of Army, Alexandria, VA, of counsel.

## O P I N I O N

**FIRESTONE**, *Judge.*

Pending before the court in this bid protest action are the parties' cross-motions for judgment upon the Administrative Record pursuant to Rule 52.1 of the Rules of the United States Court of Federal Claims ("RCFC"). The plaintiffs, CWT/Alexander Travel, Ltd. ("Alexander") and CWT/El Sol Travel, Inc. ("El Sol") (collectively "plaintiffs"), filed this action on August 17, 2007, seeking to permanently enjoin and recompete five travel service contracts awarded by the United States Army ("Army") under solicitation number W91QUZ-04-R-0007 ("Solicitation") to AirTrak Travel ("AirTrak"), WingGate Travel ("WingGate"), and Alamo Travel Group ("Alamo"). The plaintiffs contend in their complaint that: (a) a delay in the start date of the contracts by more than two years[1] and potential changes to the price of the contracts constitute cardinal changes to the contracts awarded under the solicitation; or, in the alternative, (b) the commencement of the contracts more than two years after the solicitation has resulted, in essence, in the procurement of five new sole-source contracts in violation of the Competition in Contracting Act, 41 U.S.C. § 253 (1988) ("CICA"). The defendant, the United States

[1]The contracts were originally anticipated to begin on April 1, 2005; the currently scheduled start date is October 1, 2007. As discussed infra, the delay in commencement was caused by a Settlement Agreement in an earlier bid protest arising from the same solicitation, which provided, effectively, that contracts held by CW Government Travel ("CWGT"), the incumbent and protester, to provide the subject travel services for the Army would not expire until September 30, 2007. CWGT and the plaintiffs are related to one another. The plaintiffs are franchisees of CWGT and the plaintiffs describe CWGT as their contracting partner. Indeed, based on this relationship, plaintiffs apparently were able to obtain data from CWGT, upon which they rely, without formal attribution, in their complaint and response brief. See Pl.'s Resp. Br. at 9-10; Compl. ¶¶ 13-15.

("defendant" or "government"), contends that the plaintiffs' arguments fail because the plaintiffs have failed to identify any modifications to the contracts at issue that fall outside the scope of the solicitation or violate CICA in any other way. For the reasons set forth below, the government's motion for judgment upon the Administrative Record is **GRANTED** and the plaintiffs' motion for judgment upon the Administrative Record is **DENIED**.

## BACKGROUND

### I. Background Facts

#### A. The Procurement

The Information Technology, E-Commerce and Commercial Contracting Center ("ITEC4") within the United States Army Contracting Agency, which is part of the Department of Defense ("DoD"), issued solicitation number W91QUZ-04-R-0007 ("solicitation") on February 13, 2004. AR 1. The solicitation sought proposals from small businesses for the provision of travel management and related services on a point of sale basis "to support official travel activities of authorized Department of Defense ("DoD") travelers whose duty station is within the Travel Area(s) awarded to the Contractor." AR 93. The solicitation specifically sought travel management services for travel originating at various Military Entrance Processing Stations ("MEPS"). MEPS are the locations to which military recruits first report for duty, and from which recruits are sent, in groups, to various military bases to begin basic training. The solicitation was issued during the first

phase of a two-phased plan to contract for travel management services for official DoD travelers. Def.'s Resp. at 5. Two solicitations were issued in the first phase: one for travel services at MEPS, and another for travel services in non-MEPS areas. Id. The second phase was to involve a third solicitation seeking proposals for the provision of travel services at remaining locations worldwide through multiple indefinite-delivery, indefinite-quantity contracts. Id.

The solicitation sought proposals for six distinct travel areas, identified as Travel Areas 100, 101, 102, 103, 104, and 105, which include, in total, sixty-seven MEPS sites. AR 340-41. Travel Area 100 includes seven MEPS sites located in Maine, Massachusetts, and New York; Travel Area 101 includes ten MEPS sites located in Maryland, Missouri (St. Louis), New Jersey, Ohio, Pennsylvania, Virginia, and West Virginia; Travel Area 102 includes fourteen MEPS sites located in Alabama, Florida, Georgia, Mississippi, Missouri (Kansas City), North Carolina, Puerto Rico, South Carolina, and Tennessee; Travel Area 103 includes nine MEPS sites located in Illinois, Iowa, Michigan, Minnesota, North Dakota, South Dakota, and Wisconsin; Travel Area 104 includes thirteen MEPS sites located in Arkansas, Colorado, Louisiana, New Mexico, Oklahoma, and Texas; and Travel Area 105 includes thirteen MEPS sites locates in Alaska, Arizona, California, Hawaii, Idaho, Montana, Oregon, Utah, and Washington. Id. Each of the six Travel Areas was competed separately. Id.

The solicitation contained a number of detailed requirements to be included in each offer. The contract was designated as a firm, fixed-price contract. AR 5. The offers were

required to account for the personnel, labor, services, facilities, and equipment that would be necessary to provide the requisite travel services. Id. In Attachment 9, the solicitation provided to potential offerors historical workload data for one year (October 2002 through September 2003) and estimated workload data for future years (2005 through 2010). AR 342-49. The solicitation specified that "[t]he workload counts are best estimates used for evaluation purposes," AR 1099, and that the quantities provided to the offerors "are estimates and do not necessarily reflect the number of transactions to be procured after contract award." AR 153.

Under the solicitation, the offers were required to account for both the cost of traditional travel services and for related transaction fees and other associated costs. AR 5. The solicitation specified that the travel management services would be provided "using both traditional methods and automated methods using the Defense Travel System ("DTS") web portal." AR 93. DTS is the government's own automated travel system, which the solicitation stated would "be implemented at designated Government locations over the course of the performance period" of the contract. Id. Offerors were required to submit one price model for each Travel Area for which they submitted an offer and were only required to include proposed fees for traditional transactions (and not DTS transactions). AR 153. In response to a question from a potential offeror, the solicitation specifies that "until such time that DTS functionality becomes available, MEPS transactions will be handled using traditional methods only . . . DTS transaction fees will be negotiated in base year two of the contract." AR 202.

The solicitation also contained two equitable adjustment clauses. The first, to account for potential variation in ticket volume requirements, allowed for an equitable adjustment in the contract price "if the estimated number of annual . . . transactions . . . and the actual number of annual . . . transactions varies more than 20 percent above or below the estimated quantity." AR 121-22. To obtain an equitable adjustment for ticket volume variations, a contractor would be required to submit a revised price proposal and rationale for any transaction fee adjustments to the government. AR 122. The second equitable adjustment clause allowed contractors to seek an equitable adjustment in the event that fees they received from Global Distribution System ("GDS") providers, which provide access to an on-line travel transaction processing system, were reduced or suspended. AR 122. The solicitation stated: "GDS utilization fees are currently being paid by the GDS providers. . . . Receipt of these fees have been factored by the Travel Agencies into their proposed fixed price transaction feeds identified in the contract. If after contract award . . . the payment of GDS fees are reduced or suspended by the GDS provider, the Contractor will be entitled to an equitable price adjustment." Id. To obtain an equitable adjustment of GDS fees, a contractor would be required to submit a Price Adjustment Proposal to the government. Id.

The solicitation provided that the contract would begin with a base ordering period of twenty-four months to begin "with the issuance of a contract modification for commencement of services." AR 5. The contract would also provide for three one-year option periods, which could be exercised at the sole discretion of the government. Id. At

the time the offers were submitted, the anticipated start date for the contracts was April 1, 2005, so that the base ordering period would run from April 1, 2005 to April 1, 2007, with the possibility of three one-year option periods extending the total contract performance period to April 1, 2010. AR 160, 340-41.

Under the initial version of the solicitation, proposals were due on June 14, 2004. AR 143. The solicitation was amended a number of times after being issued, and final proposal revisions were due on November 29, 2004. AR 2. The Army received a substantial number of proposals for each of the designated MEPS regions: fifteen proposals for Travel Area 100, AR 1979, sixteen proposals for Travel Area 101, AR 1988, seventeen proposals for Travel Area 102, AR 1998, nine proposals for Travel Area 103, AR 2008, thirteen proposals for Travel Area 104, AR 2015, and fifteen proposals for Travel Area 105. AR 2024. Plaintiff Alexander submitted proposals for all six Travel Areas, while plaintiff El Sol submitted proposals for Travel Areas 102, 103, 104, and 105. AR 1980, 1989, 1998-99, 2009, 2016, 2025.

Each proposal submitted was to be evaluated based on three primary factors: technical, price, and performance risk. AR 163. The factors were to be evaluated on a "best value" basis, and the solicitation specified that the technical factor was considered the most important of the three, the price factor second-most important, and the performance risk factor the least important. AR 164. The technical factors were rated according to the following scale: Outstanding, Good, Acceptable, Susceptible to Being Made Acceptable, and Unacceptable. AR 1980. The performance risk factors were rated

according to the following scale: Very Low Risk, Low Risk, Moderate Risk, High Risk, Very High Risk, and Unknown Risk. Id. The price factor was not rated, but the solicitation specified that the price factor would be evaluated for a period beginning with the "anticipated date of the first travel services site implementation within a Travel Area and ending 60 months thereafter." AR 165.

**1. Travel Area 100**

Fifteen proposals were originally received for Travel Area 100; after the initial evaluation, thirteen offerors submitted final proposal revisions. AR 1981-82. In the technical evaluation, three of the proposals received an "outstanding" technical rating: ***, ***, and ***. AR 1982. Seven of the proposals, including that of awardee AirTrak, received a "good" technical rating, and three received an "acceptable" technical rating. AR 1982-83. In the price factor comparison, AirTrak's proposed price was substantially lower than any of the other offers: AirTrak's offer was $471,693.60, while the other offers ranged from *** to ***. AR 1983. In the performance risk evaluation, four proposals received a "very low risk" rating, two proposals (including that from ***) received a "low risk" rating, five proposals (including that from awardee AirTrak) received a "moderate risk" rating, one proposal received a "high risk" rating, and one proposal received a "very high risk" rating. AR 1984-85. Based on the evaluation, the Source Selection Authority determined that the AirTrak proposal would be the most beneficial to the government, finding that "its superiority under the Price factor clearly outweighs the superiority of the offerors who are superior under one or both of the other factors." AR 1985. AirTrak was

notified of its award on January 3, 2005. Contract W91QUZ-05-C-0005 was awarded on March 17, 2005 with an initial start date of October 1, 2005. AR 1115, 1224.

### 2. Travel Area 101

Sixteen proposals were originally received for Travel Area 101; after the initial evaluation, fifteen offerors submitted final proposal revisions. AR 1988-89. In the technical evaluation, three of the proposals received an “outstanding” technical rating: ***, ***, and ***. AR 1989. Eight of the proposals, including that of awardee WingGate, received a “good” technical rating, and four received an “acceptable” technical rating. AR 1989-92. In the price factor comparison, both WingGate’s and AirTrak’s proposed prices were substantially lower than any of the other offers: WingGate’s offer was $666,000.16 and AirTrak’s offer was ***, while the other offers ranged from *** to ***. AR 1992-93. In the performance risk evaluation, three proposals received a “very low risk” rating, two proposals (including that from ***) received a “low risk” rating, seven proposals (including that from awardee WingGate) received a “moderate risk” rating, two proposals received a “high risk” rating, and one proposal received a “very high risk” rating. AR 1994-95. Based on the evaluation, the Source Selection Authority determined that the WingGate proposal would be the most beneficial to the government, finding that “its superiority under the Price factor clearly outweighs the superiority of the offerors who are superior under one or both of the other factors.” AR 1995. WingGate was notified of its award on January 3, 2005. Contract W91QUZ-05-C-0006 was awarded on February 1, 2005, with an initial start date of October 1, 2005. AR 1259, 1367.

### 3. Travel Area 102

Seventeen proposals were originally received for Travel Area 102; after the initial evaluation, fifteen offerors submitted final proposal revisions. AR 1998. In the technical evaluation, five of the proposals received an "outstanding" technical rating: ***, ***, ***, ***, and ***. AR 1999-2000. Seven of the proposals, including that of awardee Alamo, received a "good" technical rating, and three received an "acceptable" technical rating. AR 2000-02. In the price factor comparison, both Alamo's and AirTrak's proposed prices were substantially lower than any of the other offers: Alamo's offer was $668,803.80 and AirTrak's offer was ***, while the other offers ranged from *** to ***. AR 2002-03. In the performance risk evaluation, four proposals received a "very low risk" rating (including that from ***), two proposals (including that from ***) received a "low risk" rating, seven proposals (including that from awardee Alamo) received a "moderate risk" rating, one proposal received a "high risk" rating, and one proposal received a "very high risk" rating. AR 2004-05. Based on the evaluation, the Source Selection Authority determined that the Alamo proposal would be the most beneficial to the government, finding that "its superiority under the Price factor clearly outweighs the superiority of the offerors who are superior under one or both of the other factors." AR 2005. Alamo was notified of its award on January 3, 2005. Contract No. W91QUZ-05-C-0007 was awarded on March 3, 2005, with an initial start date of October 1, 2005. AR 1401, 1509.

**4. Travel Area 103**[2]

Nine proposals were originally received for Travel Area 103; after the initial evaluation, eight offerors submitted final proposal revisions. AR 2008. In the technical evaluation, two of the proposals received an "outstanding" technical rating: plaintiff Alexander and ***. AR 2009-10. Four of the proposals received a "good" technical rating, and two received an "acceptable" technical rating. AR 2010-11. In the price factor comparison, the proposed prices ranged from *** to ***; awardee Alexander's offer was $1,436,663.94. AR 2011. In the performance risk evaluation, three proposals received a "very low risk" rating (including that from ***), one proposal, from plaintiff Alexander, received a "low risk" rating, three proposals received a "moderate risk" rating, and one proposal received a "very high risk" rating. AR 2011-12. Based on the evaluation, the Source Selection Authority determined that the Alexander proposal would be the most beneficial to the government, finding that, "[a]lthough three of the offerors proposed a lower price, and one of those three was also superior under the Performance Risk factor, these advantages are outweighed by Alexander's superiority under the most important factor, the Technical factor." AR 2012. Alexander was notified of its award on January 3, 2005. Contract No. W91QUZ-05-C-0008 was awarded on March 1, 2005. AR 1540. Performance commenced on this contract on October 1, 2005. AR 1667-70.

**5. Travel Area 104**

---

[2]The contract for Travel Area 103, which was awarded to plaintiff Alexander, is not a subject of this bid protest action.

Thirteen proposals were originally received for Travel Area 104; after the initial evaluation, twelve offerors submitted final proposal revisions. AR 2015. In the technical evaluation, four of the proposals received an "outstanding" technical rating: ***, ***, ***, and ***. AR 2017-18. Five of the proposals, including that of awardee Alamo, received a "good" technical rating, and three received an "acceptable" technical rating. AR 2018-19. In the price factor comparison, Alamo's proposed price was substantially lower than any of the other offers: Alamo's offer was $885,526.40, while the other offers ranged from *** to ***. AR 2019. In the performance risk evaluation, four proposals received a "very low risk" rating (including that from ***), one proposal, from ***, received a "low risk" rating, ten proposals (including that from awardee Alamo) received a "moderate risk" rating, one proposal received a "high risk" rating, and one proposal received a "very high risk" rating. AR 2020-21. Based on the evaluation, the Source Selection Authority determined that the Alamo proposal would be the most beneficial to the government, finding that "its superiority under the Price factor clearly outweighs the superiority of the offerors who are superior under one or both of the other factors." AR 2021. Alamo was notified of its award on January 3, 2005. Contract No. W91QUZ-05-C-0009 was awarded on March 3, 2005, with an initial start date of October 1, 2005. AR 1699, 1807.

**6. Travel Area 105**

Fifteen proposals were originally received for Travel Area 105; after the initial evaluation, fourteen offerors submitted final proposal revisions. AR 2024. In the technical evaluation, four of the proposals received an "outstanding" technical rating: ***,

***, ***, and ***. AR 2025-26. Seven of the proposals, including that of awardee WingGate, received a "good" technical rating, and three received an "acceptable" technical rating. AR 2026-28. In the price factor comparison, both WingGate's and Alamo's proposed prices were substantially lower than any of the other offers: WingGate's offer was $691,835.96 and Alamo's offer was ***, while the other offers ranged from *** to ***. AR 2029. In the performance risk evaluation, three proposals received a "very low risk" rating (including that from ***), one proposal, from ***, received a "low risk" rating, seven proposals (including that from awardee WingGate) received a "moderate risk" rating, two proposals received a "high risk" rating, and one proposal received a "very high risk" rating. AR 2029-31. Based on the evaluation, the Source Selection Authority determined that the WingGate proposal would be the most beneficial to the government, finding that "its superiority under the Price factor clearly outweighs the superiority of the offerors who are superior under one or both of the other factors." AR 2031. WingGate was notified of its award on January 3, 2005. Contract No. W91QUZ-05-C-0010 was awarded on February 1, 2005, with an initial start date of October 1, 2005. AR 1838, 1946.

**B. Previous Protest to the Solicitation and Settlement Agreement**

In 2002, CW Government Travel, Inc. ("CWGT")[3] was awarded five contracts to

[3]As noted supra, n.1, the plaintiffs and CWGT are contracting partners, and the plaintiffs are independent franchisees of CWGT.

provide travel management services to fifty-four MEPS.[4] AR 2034-39. On April 26, 2004, after the solicitation for the contracts at issue in this case was issued, CWGT filed a complaint in this court, Case No. 04-718, contending that under its contract it had the exclusive right to provide travel services to the MEPS covered by the 2002 contracts. AR 2034. CWGT sought an injunction to prevent the Army from soliciting proposals for the provision of travel services to the fifty-four MEPS covered by CWGT's contracts before all of the options under the 2002 contracts had been exercised. AR 2035. If all of the options were exercised on CWGT's contracts, they would expire on September 30, 2007. Id. DoD planned to obtain the travel services covered by CWGT's contracts through both the MEPS solicitations and the phase two worldwide solicitations. Id.

On June 10, 2005, CWGT and the government entered into a Settlement Agreement which provided, in relevant part, the following: (1) the contracts between CWGT and the government could be terminated by the government at any time prior to October 1, 2007 with sufficient notice, provided that the government could not fail to exercise an option in the contracts if funds were available and if CWGT's performance was satisfactory; (2) the contracts between CWGT and the government could not be terminated if funds were available and performance was satisfactory, until the government awarded contracts and performance was commenced under the phase two solicitation; and (3) CWGT would be the exclusive provider of travel services at the fifty-four MEPS covered by the 2002

---

[4]The fifty-four MEPS for which CWGT provided travel services under the 2002 contract are located in Travel Areas 100, 101, 102, 104, and 105, but not in Travel Area 103.

contract so long as CWGT's performance was satisfactory. AR 2037-38. In essence, the effect of the settlement agreement was that performance of the contracts at issue in this case could not begin until performance commenced on the phase two contracts or the final option period on CWGT's contracts expired, which will occur on September 30, 2007. AR A40-45.

### C. Modifications to the Contracts

#### 1. Commencement Modifications

Each of the contracts at issue in this case has been modified three times to extend the scheduled start date of performance.[5] Modification P00002 to each contract, executed in August or September of 2005, extended the start dates from October 1, 2005 to April 1, 2006. AR 1247-48, 1390-91, 1530-31, 1828-29, 1967-68. Modification P00003 to each contract, executed on March 21, 2006, extended the start dates from April 1, 2006 to October 1, 2006. AR 1250, 1393, 1533, 1831, 1970. Modification P00005 to the contracts for Travel Areas 101, 102, 104, and 105, executed in April or May of 2007, extended the start dates for those areas to October 1, 2007. AR 1398-99, 1538-39, 1836-37, 1970-71. Modification P00006 to the contract for Travel Area 100, executed on April 2, 2007, extended the start date to October 1, 2007. AR 1256-58.

---

[5]The contract for Travel Area 103, awarded to plaintiff Alexander, was also modified to extend the scheduled start date of performance. Modification P00003, executed on May 27, 2005, extended the start date from April 1, 2005 to October 1, 2005. AR 1673-75. As noted supra, n.4, the contract for Travel Area 103 was not a subject of CWGT's protest, and accordingly was not affected by the Settlement Agreement between CWGT and the government.

**2. Price Modifications**

Presently, only one of the contracts at issue has been modified to change its pricing terms.[6] Modification P00007 to the contract for Travel Area 100 was executed on September 10, 2007. AR A37-39. This modification adjusted the GDS equitable fee for Travel Area 100 by $1.00. Id. The contracting officer for the remaining contracts represents that she anticipates issuing similar modifications to each of the contracts within the next few weeks, prior to the anticipated October 1, 2007 start date. AR A40-45.

**II. The Present Litigation**

On June 18, 2007, the plaintiffs filed an agency-level bid protest with DoD, alleging that the proposed commencement of the five contracts resulted in unlawful awards, failed to properly consider necessary price increases, and violated CICA. AR 2069-3166. On July 17, 2007, the plaintiffs' protest was denied. AR 3165-67. The agency held that the plaintiffs failed to include all necessary information under the Federal Acquisition Regulations ("FAR") to establish the timeliness of their protest, and that the plaintiffs' protest was untimely on its face. AR 3166. The agency held that any objections to the terms of the solicitation or the actual award of the contracts should have been filed in 2005, when the award was made, and that any objections to post-award actions, including the delays in commencement of the contracts, were untimely because the

[6]The GDS equitable fee for the contract for Travel Area 103 was adjusted by $2.00 through Modification P00006 on September 15, 2006. AR 1682-83. The fee was subsequently adjusted to $1.27 through Modification P00010 on June 15, 2007. AR 1691-93.

plaintiffs knew or should have known of the delays more than ten days before the protest was filed with the agency. AR 3167. Accordingly, the plaintiffs' protest was dismissed. Id.

The plaintiffs filed a complaint in this court on August 17, 2007. The Administrative Record was filed on August 27, 2007, and on August 31, 2007, the plaintiffs filed a motion to supplement the Administrative Record. On September 6, 2007, the court granted-in-part and denied-in-part the plaintiffs' motion to supplement. CWT/Alexander Travel v. United States, No. 07-612C (Sept. 6, 2007). On September 7, 2007, the plaintiffs filed a motion for reconsideration and hearing, which is currently pending before the court.[7] On September 11, 2007, the government filed, to supplement

---

[7]In their initial motion to supplement the Administrative Record and in their motion for reconsideration, the plaintiffs sought to include in the Administrative Record all documents and other communications between the awardees and the government relating to modifications made to the contracts and any anticipated modifications. The plaintiffs also sought any documents or other communications related to the procurement of the phase two contracts for travel services. The court granted-in-part and denied-in-part the plaintiffs' initial motion, finding that, aside from affidavits to support contentions made by the government in their pleadings, no further supplementation was necessary. CWT/Alexander Travel v. United States, No. 07-612C (Sept. 6, 2007). In their motion for reconsideration, the plaintiffs have not presented any additional arguments in support of supplementation. Accordingly, the plaintiffs' motion for reconsideration is **DENIED**.

The court notes that the plaintiffs have never sought to supplement the Administrative Record with their own data. However, they have included in their complaint and pleadings data that they obtained from the incumbent CWGT, which they contend demonstrates that workload requirements under the contracts have changed significantly over the past two years. The plaintiffs have not sought to supplement the record with this data, nor have they supported the data with an affidavit. See Pl.'s Resp. Br. at 9-10; Compl. ¶¶ 13-15. It is well-settled that unsubstantiated factual assertions in pleadings do not constitute evidence. See, e.g., Perri v. United States, 53 Fed. Cl. 381, 410 (2002); Slattery v. United States, 53 Fed. Cl. 258, 281 (2002) ("Courts have determined that pleadings and complaints are not evidence.") (citation omitted).

the Administrative Record, an affidavit from the contracting officer explaining the status of any modifications to the contracts and the reasons for the delays in the commencement date of the contracts. On September 14, 2007, the plaintiffs filed a motion for judgment upon the Administrative Record, and on September 20, 2007, the government filed a cross-motion for judgment upon the Administrative Record. Oral argument was held on September 24, 2007.

## DISCUSSION

### I. Standard of Review

This court has jurisdiction over the plaintiffs' claim pursuant to the Tucker Act, 28 U.S.C. § 1491(b)(1) (2004), which grants the court jurisdiction over any objections "to the award of a contract" or any "alleged violation of statute or regulation in connection with a procurement." Id. This court's review of agency actions in a bid protest is governed by the standards set forth in the Administrative Procedures Act, 5 U.S.C. §§ 701-706 (2000) ("APA"). 28 U.S.C. § 1491 (b)(4) (2004); Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332-33 (Fed. Cir. 2001). Specifically, the court must consider whether the agency's actions were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A) (2004); see also Blue & Gold Fleet, L.P. v. United States, 492 F.3d 1308, 1312 (Fed. Cir. 2007); Bannum, Inc. v. United States, 404 F.3d 1346, 1351 (Fed. Cir. 2005). The plaintiffs must also demonstrate that the agency's actions prejudiced the plaintiffs, such that there was a

"substantial chance" they would have received the contracts but for the alleged error. Bannum, 404 F.3d at 1353; Alfa Laval Separation, Inc. v. United States, 175 F.3d 1365, 1367 (Fed. Cir. 1999).

## II. The Modifications to the Contracts At Issue Do Not Constitute "Cardinal Changes" Which Would Require Re-Procurement Under CICA.

The plaintiffs' action centers around their contention that the modifications made to the five contracts at issue constitute cardinal changes to the contracts, and that, under CICA, the government should have re-competed the contracts instead of issuing the modifications.[8] CICA requires agencies, in procurement, to "obtain full and open competition through the use of competitive procedures." 41 U.S.C. § 253(a)(1)(A) (2004).

While CICA does not prohibit modifications to contracts, it is now well-settled that "modifications outside the scope of the original competed contract fall under the statutory competition requirement." AT&T Commc'ns, Inc. v. Wiltel, Inc., 1 F.3d 1201, 1205 (Fed. Cir. 1993). As this court stated in CESC Plaza Ltd. P'ship v. United States, 52 Fed. Cl. 91 (2002), a modification that "materially departs from the scope of the original procurement violates CICA by preventing potential bidders from participating or competing for what should be a new procurement." CESC Plaza, 52 Fed. Cl. at 93. In determining whether a modification is outside the scope of the original contract the courts look to the "cardinal

[8]While the plaintiffs present their bid protest case as two separate arguments in the alternative (first, that the modifications to the contracts constitute cardinal changes, and second, that the delay in performance has resulted in an unlawful sole source procurement) the court evaluates their arguments as one.

change" doctrine. AT&T, 1 F.3d at 1205. A cardinal change "occurs when the government effects an alteration in the work so drastic that it effectively requires the contractor to perform duties materially different from those originally bargained for. Id.

The plaintiffs argue that the commencement date modifications to the contracts constitute cardinal changes and that the changes require a new procurement. Specifically, the plaintiffs contend that the solicitation and procurement were explicitly tied to the price data provided by the government to the offerors, and the delay in commencement of the contracts has made that price data, and the offerors' reliance on the data, moot. Relying on a number of Government Accountability Office ("GAO") decisions, the plaintiffs argue that, while a delay does not typically constitute a cardinal change, a delay can be considered a cardinal change if time is critical in defining the obligations under the contract. See Defense Sys. Group, B-240295, 1990 WL 293536 (Comp. Gen. Nov. 6, 1990); Ingersoll-Rand, B-225996, 87-1 CPD ¶ 474 (Comp. Gen. May 5, 1987) (finding "a significant difference between those situations where a contractor is given additional time to perform a contractual obligation and those where time is used to define the extent of the obligation"). The plaintiffs assert that, once performance of the contracts begins, the government will necessarily engage in negotiations of price increases and the resulting price modifications, which the plaintiffs argue would be a violation of the competition requirements under CICA. The plaintiffs contend that, because the price data included in the solicitation was so detailed and explicit, and because the price data was strictly tied to

the anticipated performance dates of the contracts, the delay in commencement constitutes a cardinal change.

The plaintiffs also argue, without offering any evidence to support their assertion, that the government, in considering the contract modifications, failed to consider price increases that would occur in proceeding with the contracts.[9] The plaintiffs contend that the prices offered by the awardees in 2004 are dramatically different from the prices that will be required when performance commences in 2007. The plaintiffs point to the possibility of a transition from traditional travel services to DTS, which was expressly contemplated by the solicitation, AR 93, and assert that a transition to DTS would substantially change the price of travel services and thus the pricing submitted by offerors. Therefore, the plaintiffs argue that, given the possibility of a full transition to DTS, the contracts should be re-procured to allow offerors to submit revised prices and ensure complete competition. The plaintiffs did not challenge this aspect of the solicitation at the time the contracts were awarded.

The government argues, in response, that the commencement date modifications to the contracts are entirely within the scope of the solicitation. The government asserts that each offeror was put on notice by the solicitation that performance on the contracts would

---

[9]As noted supra, while the plaintiffs make a number of assertions throughout their briefs regarding the dramatic price changes that the plaintiffs allege will affect the contracts at issue once performance is commenced, the plaintiffs provide no evidentiary support for these assertions, and assertions alone do not constitute evidence. See, e.g., Perri, 53 Fed. Cl. at 410; Slattery, 53 Fed. Cl. at 281.

begin not upon the award, but instead once a contract modification was issued. AR 5. The government also asserts that certain price modifications were contemplated by the solicitation through the equitable adjustment clauses to account for potential variation in ticket volume requirements and the possibility of a change in DTS-related transaction fees. AR 121-22. The government further contends that the current base performance period of the contracts falls within the scope of the contemplated five-year performance period used for price evaluation purposes, and that, accordingly, none of the commencement date modifications have changed the time of performance sufficiently to constitute a cardinal change. Finally, the government argues that, to the extent the plaintiffs protest any changes in price that could result from a delay in commencement of the contracts, the plaintiffs' argument is premature, as no such modifications have been executed. Therefore, the government argues that the plaintiffs have not established any violation of CICA.

The court finds that the delay to the start date and the alleged price modifications do not amount to a "cardinal change" or other violation of CICA. The plaintiffs' allegations are most similar to those brought by the plaintiffs in CESC Plaza, in which the protestors argued that "the sum of the changes materially alter[ed] the contract, not that the specific changes themselves [were] out of scope modifications." CESC Plaza, 52 Fed. Cl. at 94. In CESC Plaza, the court held that the plaintiffs would be required to demonstrate that the sum of the modifications were "materially outside the scope of the [solicitation] and that

these modifications were not foreseeable to the bidders." Id. The court adopts the test articulated in CESC Plaza and holds that the plaintiffs in this case cannot prevail on their CICA violation or cardinal change claims because they cannot demonstrate that the delays in commencement of the contracts or the possible price increases are materially outside the scope of the contracts and were not foreseeable to the offerors.

First, as the government notes, the solicitation did not specify a definite start date for commencement of performance or specific dates between which the base performance period had to be completed. Instead, the solicitation stated that "the base ordering period begins with the issuance of a contract modification for commencement of services through 24 consecutive months" and that three additional one-year option periods could be exercised by the government. AR 5. Thus, the solicitation contemplated only that the contract would start at some time after the award date. In such circumstances, the plaintiffs' reliance on the GAO decisions in Defense Sys. Group and Ingersoll-Rand, which involved the requirement for performance by specific dates, is misplaced. In addition, where as here, the solicitation did not confine the base period of performance to a set time period expiring on April 1, 2007, the court will not read set dates into the contracts.[10] Where flexibility has been incorporated into the solicitation, the court must

[10]The plaintiffs suggest that, due to the delay, the current contracts should now be viewed as the exercise of the "option periods" provided for by the solicitation and that the contracting officer has not followed the rules governing the exercise of options. There is no evidence to suggest that the delay in performance should cause the current period of performance to be viewed as the exercise of "options" under the subject contract rather than the beginning of the base performance period. As the solicitation stated, "the base performance period begins with

respect that determination. See AT&T, 1 F.3d at 1205.

Second, the proposed price modifications are not enough alone or in combination with the commencement date modifications to establish a cardinal change or violation of CICA. The solicitation contemplated price changes and authorized price negotiations to deal with changes in ticket volume requirements and technology. Indeed, given the nature of the travel services required under the contract, price changes were viewed as inevitable. The government has limited control over the number of recruits or the location of recruits needing travel services. Thus, authorization for price changes in what was otherwise a fixed-price contract was written into the solicitation to meet the Army's needs. Price changes were therefore both authorized and foreseeable. Moreover, plaintiffs' contentions regarding the size of any price change are unsubstantiated, as no major price modifications have been issued. The plaintiffs have failed to establish that the delay will, in fact, result in any significant cost increase to the government.

In such circumstances, plaintiffs have failed to establish that the contracts were cardinally changed or that any other CICA violation has occurred.

## CONCLUSION

For all of the foregoing reasons, the plaintiffs' motion for judgment upon the Administrative Record is **DENIED**. The government's motion for judgment upon the

---

the issuance of a contract modification for commencement of services through 24 consecutive months." AR 5 (emphasis added).

Administrative Record is **GRANTED**.[11] Each party is to bear its own costs.

The parties are directed to file by **Tuesday, October 2, 2007** their requests for the redaction of protected/privileged material before the court issues its published opinion. The parties shall submit a courtesy copy of these requested redactions to the court via e-mail to the following address: "firestone_chambers@ao.uscourts.gov."

**IT IS SO ORDERED.**

s/Nancy B. Firestone
NANCY B. FIRESTONE
Judge

[11] Because the court has determined that the plaintiffs have not provided sufficient evidence to demonstrate that the modifications to the contracts at issue constituted a cardinal change and or a violation of CICA, an analysis of the parties' arguments regarding the plaintiffs' request for a permanent injunction is not necessary.